## JOHN C. SMITH *v.* THE MECHANICS AND TRADERS' BANK.

The plaintiff, a broker, discounted without inquiry, for an entire stranger, a forged bill purporting to be drawn on and accepted by a commercial house in New Orleans. In payment, he gave the forger his check upon the bank, payable to the order of the supposed acceptors of the bill. The forger obtained the money from the bank by forging the name of the supposed acceptors. The plaintiff sued the bank for the amount of the check.

*Held*: That the plaintiff did not exercise due precaution in thus taking the bill without inquiry; that filling up the check to the order of the supposed acceptors of the bill, instead of the party for-whom the bill was discounted, was not in the usual course of business; and was an unjustifiable attempt to shift from himself to the bank the duty of making inquiry, and the risk of loss incurred by his taking forged paper; that by placing his check in the hands of the probable forger of the bill, he supplied him with the means well calculated to deceive and impose on the bank; and that, although the bank had been guilty of negligence in paying the check, yet the loss should properly be borne by the plaintiff.

The relation between a bank and its customers, requires perfect good faith.

A discounter, whose business it is to buy bills, is not in the same situation as a bank whose business is to pay, and greater caution is required from the former than the latter.

No person should buy bills from entire strangers, without using a proper and reasonable degree of caution, and after proper inquiry.

SMITH
*v.*
MECHANICS
AND TRADERS'
BANK.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *A. K. Josephs* and *J. R. Grymes*, for plaintiff, contended: The plaintiff, a depositor in the Mechanics and Traders' Bank, sues to recover the amount of a check drawn by him, to the order of *Payne* and *Harrison*, a well known commercial house in this city, and paid by the bank upon a forged endorsement. To wit: "No. 1572. New Orleans, November 7th, 1850. Mechanics and Traders' Bank, pay to *Payne* and *Harrison*, or order, twenty-nine hundred and eight dollars and sixty-seven cents. $2908 67. Pp., J. C. SMITH. J. KILTY SMITH. (Endorsed,) PAYNE and HORRIN."

The defendants, in their answer, deny their liability to loss in consequence of the forgery; because, the payees, *Payne* and *Harrison*, never had any interest or right of property in the check, but that the same was delivered by plaintiff to the holder of an alleged acceptance of *Payne* and *Harrison*, as the proceeds of the discount thereof by plaintiff, and was correctly paid to a fictitious payee. The evidence shows, that a draft purporting to have been drawn by one *W. C. Ventriss*, and accepted by *Payne* and *Harrison*, was discounted by plaintiff; the same having been offered by a person he did not know, he took the usual precaution of drawing his check for the proceeds to the order of the acceptors, *Payne* and *Harrison*. *Huntington*, a partner in the house of *Payne* and *Harrison*, declares, that the names of *Payne* and *Harrison* on the draft, as well as on the check, are very bad imitations of the signature of the house, and the name of the drawer, *Ventriss*, is also a forgery. By inspecting the check, it will be seen, that instead of the name of *Harrison*, one of the payees, *Horrin* has been most distinctly substituted.

It was admitted on trial, that the plaintiff has, during several years, had large sums of money deposited in the defendants' bank, which he draws from time to time. *Cazenave* has had charge of plaintiffs' books for four or five years, and testifies, that in taking notes it is his habit to draw checks for the proceeds, to the order of the persons for whom they are discounted; as it often happens that clerks of commercial houses with whom he deals, call for the proceeds of paper discounted for their employers. The only witness offered by the defendant, *Stringer*, testifies as follows: "I am paying teller of defendants. Plaintiff is a customer of the bank, and does a large business there. Plaintiff generally draws his checks to order; in some instances, they have been made to bearer. There is no particular understanding between plaintiff and defendants as to the mode of conducting their business. *Payne* and *Harrison* do not keep an account with defendants." Cross-examined. "Plaintiff is a broker, and keeps a considerable account with defendants, and has for a long while. Where the party in whose favor the check is drawn is not known, the bank is in the habit of making inquiries; where the parties are known, they pay without verifying the signatures of the payees. I have refused to pay checks of plaintiff's and other parties, where I did not know the party in whose favor the check was drawn, and required plaintiff and others, in those cases, to verify the checks."

The duties and liabilities of the defendants, as general depositaries, rest upon an immovable basis of principles and decisions of daily occurrence and daily recognition; and their responsibility for losses, occasioned by ordinary neglect, naturally results from the great profit and advantage which they derive from the employment of the monies entrusted to their safe keeping. And it has been invariably held, that loss by payment of a check forged either in the drawer's or

SMITH
v.
MECHANICS
AND TRADERS'
BANK.

payee's name, or altered as to the sum, must fall upon the banker; because it is his duty to see that a check is genuine in all respects. In the case of *Hall* v. *Fuller*, cited at length in Chitty on Bills, at the foot of page 287: " The facts stated in the special case were these: The plaintiff kept cash at the house of the defendants, who are bankers. The plaintiff, having occasion to pay a sum of £3 to a tradesman, drew a check for the amount upon the defendants, and delivered it to the payee, who told him that he wanted to send it into the country. It was drawn in the usual form, payable to the payee, or bearer, with the plaintiff's signature and the date. When the check was presented for payment, the amount was altered from £3 to £330. No suspicion being entertained by the defendants' clerks, it was paid at the counter, as a matter of course. At that time, the plaintiff had not cash in the defendant's hands to the full amount of the check thus altered. In no instance, had the plaintiff overdrawn his account, and had never given the defendants notice that he wished to have credit ultra the balance in hand. Great ingenuity had been displayed in altering the check, and the fraud could not be detected upon a cursory view. Soon afterwards, the plaintiff, finding that his account was overdrawn, the fraud was detected, and he called upon the defendants to indemnify him for the money which they had so paid without his authority; which the defendants refusing to do, this action was brought. The question for the opinion of the court was, whether the action was maintainable, either for the whole or any part of the amount of the check ? *F. Pollock*, for the plaintiff, argued, that as the defendants must, in point of law, bear the loss of a check forged in every respect, the same consequences would follow where the forgery was only of a part. Payment of a check, forged either in the drawer's or the payee's name, had been held to throw the loss upon the banker, whose duty it is to take care that no fraud is committed on his customer's money. The forgery, in the amount of the check, was just the same as if the check was wholly forged in all respects. This, in fact, was not the plaintiff's check, and payment of it by the defendants could not bind his effects. Suppose this were a deed, and the plaintiff had been sued upon it, he might plead *non est factum*. Here the drawer of the check had no means of guarding against fraud; not so the defendants, who, supposing them to be deceived, must bear the loss. Besides, as the check exceeded the amount of the plaintiff's balance in hand, they ought to have paused and made inquiry before they paid it, especially as the plaintiff had never overdrawn his account and desired no accommodation. In this respect, the defendants were guilty of negligence, and *a fortiori* they must bear the loss. *Gouldburne*, for the defendants, contended, that if this action could be maintained, it would throw upon bankers a new, and certainly a most fearful responsibility. He admitted, that a banker paying a check forged in the signature, could not throw the burthen of the loss upon his customer; but it had never yet been decided that this principle extended to an alteration, either in the amount or in the payee's name. It was the duty of the banker to look only to the drawer's name, which was the only criterion which he might reasonably be supposed to have as to its genuineness. There was no analogy between a deed and a banker's check. The slightest alteration in an instrument of the former description would vitiate it; but not so of a check. If there was any negligence in this case, it was all on the side of the plaintiff, in paying a check to a person who told him that he meant to remit it into the country. Abbott, C. C. was of opinion, that the action was maintainable: ' It was the duty of a banker to take care that he did not pay away his customer's money, without a sufficient authority for that purpose; and if he paid to a forged order, he must bear the loss; and it was immaterial whether the order was forged wholly or in part. Here the defendants had paid a sum of money belonging to their customer, which the latter had never authorized him to pay; and therefore they could not charge him with the loss. Under these circumstances, the defendant was entitled to judgment.' Bayley, J., concurred: ' The banker was bound to pay only to his customer's order; and if he unfortunately paid a forged order, he alone must bear the loss. It is the banker's duty to see that a check is genuine in all respects.' Judgment for the plaintiff. 8 Dowl. and Ry. 465, S. C.''

In the case of *Laborde* v. *The Consolidated Association*, the bank was held liable for the loss occasioned by payment of a forged check presented by the plaintiff's clerk, who had committed the forgery. 4 R. R., 193. Also, in *Etting* v. *The Commercial Bank*, 7 R. R., 461, where the forgery was committed by a person in the plaintiff's employment, and the court say, "was so well executed

as to deceive a close and accurate observer." And nothing but proof of extraordinary neglect on the part of the plaintiff, calculated to mislead the bank and facilitate the commission of the forgery, could justify your reversal of the judgment appealed from. The evidence, on the contrary, establishes great caution and prudence on the part of the plaintiff, and a strict conformity with his usual course of business with the bank, and with his habitual reliance upon their usage and responsibility, even in the extreme case of checks drawn to the order of strangers; which, as we have seen, they undertake to verify as to the genuineness of the payee's signature. In the case before you, the check was made payable to the order of a long established commercial firm of the city, whose *(Huntington)* handwriting should have been well known at the bank, which was in the daily habit of discounting or collecting notes and obligations bearing their signature. And, indeed, there can be no reason shown to justify the bank in assuming to exercise a greater degree of diligence and care in the case of checks payable to unknown persons, than that which they conceive themselves bound to employ when the payees are known to the bank; in which case "they pay without verifying the signatures." *(Stringer.)* A course which no prudent man would pursue in the management of his own affairs, and cannot certainly protect a bailee held to extraordinary diligence from the nature and conditions of the deposit. Angell and Ames on Corporations, ed. 1846, 223.

In this condition, the defendants expect to relieve themselves from the consequences of extraordinary neglect, by showing that the transactions which led to the drawing of the check were of an unreal character; that the consideration given to the plaintiff being a forged bill, and *Payne* and *Harrison* were consequently fictitious payees; whose endorsement upon the check was unnecessary. As to the right of a bank to ascertain in what manner its customer is disposing of the money for which he checks, it may be questioned by some, as likely in certain instances to lead to unnecessary developements; although, if sanctioned by the court, a great moral reform might by this means be effected. Take the very extreme case of money lost at the gaming table by a depositor, who draws a check in the usual form, to the order of the winner. Should the payee's endorsement be forged, or the amount increased, upon the doctrine contended for, it certainly would be wrong to throw the loss upon the bank. It may be very true, as in the present case, that they had enjoyed the use of the drawer's money; and that the immediate cause of the loss was their neglect to verify the payee's signature; but the original transaction being illegal, immoral, and out of the usual course of business, the money was consequently intended to be paid by the customer, without consideration or real benefit, which must necessarily justify the subsequently gross neglect by which the loss was occasioned. It is urged, with equal force of reasoning, that *Payne* and *Harrison*, although in fact real persons, were, in point of law, fictitious payees; because they are without interest in the matter.

The same difficulty would occur in a large class of cases in which payments are made by clerks, in whose favor the employer has a habit of drawing his checks; indeed, the right of the depositor to consult his own convenience or caprice upon this subject, cannot be questioned, provided that, in so doing, he does not, by any negligent or improper act, expose the bank to loss by facilitating the forgery, or inducing a relaxation of the extreme vigilance imposed upon them by custom and law. In the case of *Dana* v. *Underwood*, 19 Pickering, 99, it was held, that a promissory note purporting to be payable to a real person, and endorsed in a forged handwriting resembling and intended to pass for his, cannot be considered as a note payable to a fictitious payee. Chief Justice Shaw, in delivering the opinion of the court, p. 103, says: It was contended, that this might be considered as a note payable to a fictitious person; and so, in legal contemplation, may be treated as a note payable to bearer, and pass by delivery without endorsement. But the court are of opinion, that this is entirely unsupported by proof, and inconsistent with the proof. That a note is payable to a fictitious payee, is a matter of fact to be proved. In this case, the original offer was of a note signed by *Charles Brown* and *Lindemard*, as makers, and *Nathaniel Brown*, the brother of *Charles*, as endorser. *Nathaniel Brown* was often at his brother's counting-room, and transacted his business there. The handwriting resembles his, and was undoubtedly intended to pass as his. If it was not actually endorsed by him, and it could be proved that it was done by any other person through whose hands it had passed, can it be doubted that the proof would convict that person of forgery? But it is ingeniously urged, that any

SMITH
v.
MECHANICS
AND TRADERS'
BANK.

person is to be deemed fictitious to whom the note is not in fact transferred, or intended to be transferred, and who in fact has no interest or concern in it. But if this principle could be adopted, it would be wholly immaterial whether the endorsement is genuine or not, so far as to give to the instrument the character of a negotiable note, and when the endorser himself is not actually sued. For it would be always open to the dilemma; if he is a party, it is a genuine endorse-- ment; if he is not, he is a fictitious payee, and no endorsement is necessary.

In the case of *Laborde*, the forgery was committed, and the check presented, by a person in the employment of the drawer, and well known at the bank. So in *Etting's* case, where it was shown to have been so skilfully executed, as almost to defy detection. Yet, in both cases, the banks were held for the amount; although the confidential relations which exist between a clerk and his employer afforded, without doubt, the opportunity and inducement to the crime.

In the case before you, not only was the check paid to a stranger, but it is proved to be a very bad forgery; indeed, the endorsement is of a different name from that of the payees. Instead of *Harrison*, *Horrin* is so distinctly signed as to strike the most casual observer; and with the exercise of ordinary vigilance should never have been received. Suppose the transaction to have been a real one between *Payne* and *Harrison* and the plaintiff, would it in any way have changed the duties and responsibilities of the defendants; or, in other words, were they prevented by the fault of the plaintiff, and the character of the present transaction, from employing the same degree of care and prudence which they would undoubtedly have been required to exercise in such case? The contrary has been clearly shown; on the side of the plaintiff, extreme and usual caution, which a long course of business had made familiar to the bank; on the part of the defendants, gross neglect, without which the loss could never have occurred. C. C. 2882, &c. Byles on Bills, Law Library, vol. 61, p. 253, § 251, 254. In the case of *Young* v. *Grote*, Bing., 253, 13 Eng. Com. Law, 421, the court defined the degree of negligence on the part of the customer, which would exonerate the bank from the loss in case of forgery, and which must clearly result from some act entirely out of the usual and regular course of business, and calculated to expose the banker to new and extraordinary risks; as where a check was drawn in a careless and improper manner, and altered by the drawer's clerk. But the doctrine of *Hall* v. *Fuller*, is expressly sustained; and the loss thrown on the bank, where the check is drawn in the usual and regular mode, and the forgery committed, as in the present case, by a stranger.

*L. Pierce*, for the defendants, contended: *Smith* gives a check to a stranger, in payment to him of an acceptance of *Payne* and *Harrison* held by him, and and makes it payable to persons having no interest in connection with it, to wit: *Payne* and *Harrison*. The bank pays it to the original holder, to the person to whom it was given as owner. Has *Smith*, the drawer, a right of action, because the payee's name, the payee who had no right or interest in it, was forged? Is there a case, where in case of forgery of payee's name, the drawer recovered back his money from his banker? Is it not always the original holder, the real payee, or in case of fictitious payee, the *bonâ fide* owner? Is there any one but *Payne* and *Harrison*, or a subsequent holder, that can complain? and if they do not, where is the injury? The check was the property of the real payee, the man who presented himself as owner of the note, of which this check was the cash payment, and who probably, was some innocent transferree, as it is not likely the forger would run the risk of being caught and stopped by *Smith's* discovery of the forgery.

2. This check was given in payment of a supposed real draft of *Ventriss*, accepted by *Payne* and *Harrison*; both were forgeries, it is true; but who first suffered himself to be imposed upon? Who gave the means to a stranger, whom no one knew, to impose upon the bank, by a forged endorsement of a house, whose signature was not in bank, by suffering himself to be imposed upon by not only one, but a double forgery? The plaintiff: it was his want of care and diligence that caused him to be imposed upon—his desire of interest and commissions; and it was he that put the further means of imposition upon others into the stranger's hands. The measure of diligence required between the two parties, is entirely different. *Smith* is a broker, receives propositions at his leisure, can tell the applicant for discount to call again, can acquire information of signatures, by sending to another street, or inquiring himself: the paying teller of a bank is nailed to his counter, he cannot stop the operations of the bank

to verify every signature; enough for him that he knows that *Smith* has really drawn a check that is good, against *Smith*, who cannot complain; but he knows, and the bank knows, that he takes the risk of the signature of the payees; that if a forgery, there will be a claim by the payees, that may avail; but if it never belonged to the payees, then he is safe.

3. *Smith* is required by law, to be more exact, and diligent and cautious; and the first error, the first false step is his. The check was made to fictitious payee, or to bearer, and it was good payment on the part of the bank. If *Payne* and *Harrison* were not the owners of the check, had no knowledge of it, nothing to do with it, they were not the original holders or owners of the check, they were literally fictitious payees, for they were not really payees. The check was owned by the holder, and was intended by *Smith* to be given to him, in payment of the accepted draft. If, as urged, it was purposely so made by *Smith*, to test the genuineness of *Payne* and *Harrison's* acceptance, it was putting arms into the hands of this unknown, to defraud and entrap others; and the loss is occasioned by the wrongful act of *Smith*.

4. That there was not that *mala fides* on the part of the bank that, under the latest decisions, can make them liable. They are bound to know the hand-writing of their customers, no doubt, but they are not bound to know the signatures of firms, who are not their customers; and if they run the risk as to them, the customer cannot take advantage of it. There was no mistake as to him, and if he suspected anything wrong, it was his business to have put the paying teller on his guard as to the check, and not thus covertly make the bank his guardian or sponsor, for all the mistakes that his desire for discount may occasion: there was no *mala fides*, and the check was as if payable to the bearer.

5. The amount of the principle established in this case, should judgment be in favor of plaintiff, is, that he can be as careless as he chooses, discount with every kind of character, "hang out his sign,—bills discounted for strangers, if they have good names on them, without any questions asked;" and by making his own check payable to one of the debtors on the note, be perfectly secure from imposition, making the bank his warrantor, by giving the stranger his real check, and almost asking him to forge the endorsement; for he well knows, that the debtor of the note would never guarantee his signature, by endorsing a check in which he had no interest, and for an unknown man.

The position thus secured would be lucrative and safe, but abhorrent to common justice.

Authorities for defendant: "Where the loss has fallen, there it must lie; one innocent man must not relieve himself by throwing it on another." 3 Burrows, 1354. 1 Blackstone, 390. "Where one of two innocent persons must suffer by act of a third, he who has enabled such third person to occasion loss, must sustain it." Chitty, 256. 2 T. R. 70.

Fictitious payee: "If a note be made payable to a fictitious person, or his order, although no order can be made by the payee, who is not in existence. yet, if the instrument be issued into the world, with an endorsement in blank, purporting to be made by such fictitious person, it will, as against the drawer and maker, be considered as payable to bearer." Smith's Merc. Law, 131, (Art. 172.) Hy. Black, 569. *Collis* v. *Emmett*, 1 Hy. Black, 318. Bayley on Bills, 2 Ed., 26, 28. *Tatlock* v. *Harris*, 3 T. R. 174. *Vere* v. *Lewis*, Ib. 182. *Minot* v. *Gibson*, Ib. 481. Contrat de Change, Pothier, 99, 104. 17 Wendell, 100. Chitty, 20, note 287, 1836. *Simmons* v. *Bond*, 2 Neville and Manning, 608. Deposit is a loan, 17 Wendell. "We consider this an agreement between all the parties, to appropriate so much property to be carried to the account of the holder of the bill." *Tatlock* v. *Harris*, 3 T. R. 182. "There would be great inconveniences, if such an action might not be brought by the bearer, if no action could be brought in the name of the person to whom the bill or note was originally made payable. That person might release the action, or a debt due from him might be set off against it in account." *Grant* v. *Vaughan*, 3 Burrows, 1529.

The original holder can recover only: "When a bill is assignable only by endorsement, as no interest can be conveyed otherwise than by that act, and as it is a general rule that no title can be obtained through a forgery, and consequently, the original holder in such case may, when he has regained possession of the bill, recover against the acceptor and drawer, although the acceptor may have paid the bill." Chitty, 260, do. 259, 260.

Degree of diligence: "More caution is required in case of a discounter, than a payer, &c." 2 Carrington and Payne, 215, 98. 5 Dowling and Ryland, 326, 237. Byles, 2d Ed. 56, 93. of 1st Ed., 85. 3 Barn. and Cress. 466.

What negligence makes liable: "In the subsequent case of *Backhouse* v. *Harrison*, which was the case of a lost bill, the same principle was adopted, and it was held, that though it was a good defence, that the plaintiff took the bill fraudulently, or under such circumstances, that he must have known that the person from whom he took it had no title, or that the plaintiff was guilty of gross negligence in taking it, yet, it was no defence, that he took it under circumstances in which a prudent and cautious man would not have taken it." 5 Barn. et als., 1098. 3 N. and M., 188. "And the case of *Goodman* v. *Harvey*, 4th Adol. and Ellis, 870, and 6 N. and M., 372, has since finally decided, that even gross negligence is not alone enough to destroy the title of a holder for relief, but that a case of *mala fides*, on the part of such holder, must be made out, in order to defeat his claim." Chitty, 257. 8 Barnwell and Cress. *Gill* v. *Cutick*. Common Law Rep.

The judgment of the court was pronounced by

EUSTIS, C. J. The plaintiff is a broker in this city; his business is that of discounting bills and notes. He kept an account with the Mechanics and Traders' Bank; the banking house is opposite his office in Canal street. On the 7th of November, 1850, the plaintiff discounted a forged bill, offered for discount by a person unknown to him. It purported to have been drawn by *W. C. Ventriss* on *Payne* and *Harrison*, a well known house in the city. The acceptance of *Payne* and *Harrison* was forged, and the forgery was a very bad imitation of their signature. The name of the drawer was forged. Of *Garland*, the payee and endorser of the bill, no account whatever is given, and the presumption is, that he is a fictitious person. The plaintiff gave a check on the bank, for the net proceeds of the bill, to the unknown person offering it for discount. It was drawn in favor of *Payne* and *Harrison*. They kept no account with the bank, nor is any relation established by the evidence between them and the plaintiff, except that resulting from their forged acceptance of this bill. The check was paid, on demand, at the bank; the endorsement of *Payne* and *Harrison* having been forged. This forgery was also a very bad one; the name of *Horrin* was put in the endorsement, in the place of that of *Harrison*, which made it read *Payne* and *Horrin*. The payment of this check must be conceded to have been gross negligence on the part of the clerk of the bank.

The liability of the bank to *Payne* and *Harrison*, for having paid their 'forged check, would be unquestionable, had they an interest in it. But they are entire strangers to the whole transaction; they have no interest in the check, and no claim against the bank growing out of it. The plaintiff brings his action against the bank for money deposited, and the bank sets up this payment of the plaintiff's check, with the forged endorsement of *Payne* and *Harrison*, as a defence to his action.

As a general rule, it is undoubtedly true, that the banker *is* bound to pay on his customer's order, and if, unfortunately, he pay a forged order, he alone must bear the loss. It is conceded, however, by the learned counsel, in their printed argument, that proof of extraordinary neglect on the part of the plaintiff, calculated to mislead the bank and facilitate the commission of the forgery, would justify the reversal of the judgment appealed from, which is in their favor. We think, that the current of decisions fully justifies this admission. Indeed, to exonerate the banker who pays a forged check, gross negligence, on the part of the customer, does not seem to be required. In the case of *Young* v. *Grote*, although the plaintiff was found to have been guilty of gross negligence n leaving blank checks with his wife, and depending on her to fill them up in such sums as his business might require, and in her delivering one of them filled up in such a manner that the sum could be easily altered, yet the chief justice, in

conceding the general rule, that the banker who pays a forged check is bound to pay the amount again to his customer, states, though that rule be perfectly well established, yet, if it be the fault of the customer that the banker pays more than he ought, he cannot be called upon to pay again. In support of this opinion, he cites the authority of Pothier, in commenting on the case put by Scacchia, and, in conclusion, adds, "we decide here on the ground, that the banker has been misled by want of proper caution on the part of his customer."

The evidence establishes nothing of neglect on the part of the plaintiff; on the contrary, it is urged, by counsel, as establishing great caution or prudence on his part, and a strict conformity with his course of business with the bank. It is not assuming, therefore, more than the evidence justifies, to consider that what was done by the plaintiff, he did from caution and with a view to protect his interests. There is no intimation of any want of correct conduct on his part in this affair, nor any evidence whatever to that effect. It must be considered as unimpeached, and that he acted according to his own views of his rights.

It was admitted, on trial, that the plaintiff has, during several years, had large sums of money deposited in the bank, which he draws from time to time. *Cazenave*, who has had charge of the plaintiff's books for four or five years, testifies, that in taking notes, it is the habit to draw checks for the proceeds to the order of the persons for whom they are discounted, as it often happens that clerks of commercial houses with whom he deals, call for the proceeds of paper discounted for their employers. The teller of the bank testifies, that the plaintiff does a large business with the bank. He generally draws his checks to order; in some instances, they have been made payable to bearer. There is no particular understanding between the plaintiff and the bank, as to their mode of doing business. As the right of the plaintiff to recover, depends upon his conduct in the business for which the check was given, it is necessary to consider it in relation to those rules of law, which must always control the acts of merchants and bankers, in their dealings with each other. That the relation between a bank and its customers requires perfect good faith, is conceded; and, we conceive, that the caution required from the customer, in his transactions with the bank, is established by the decisions of the highest authority in mercantile matters, which have been cited by counsel.

It is admitted, that the person who passed the forged bill to the plaintiff, was a stranger and unknown to him. Let us examine how the law considers the taking of a bill under these circumstances.

The rule may be considered established, that a discounter, or man whose business it is to buy bills, is not in the same situation as a bank, whose business it is to pay, and greater caution is required from the discounter than the bank. *Snow* v. *Peacock*, 12 English C. L. Rep., 98. Byles on Bills, 85.

In *Gill* v. *Cubitt*, 10 Eng. C. L. Rep., 216, Abbott, Chief Justice, says: "It appears to me, that no person should take a security of this kind from another, without using reasonable caution. If he take such security from a person whom he knows, and whom he can find out, no complaint can be made of him. In that case, he has done all any person could do. But, if it is to be laid down as the law of the land, that a person may take a security, of this kind, from a man of whom he knows nothing, and of whom he makes no inquiry at all, it appears to me, that such a decision would be more injurious to commerce than convenient to it, by reason of the encouragement it would afford to the purloining, stealing, and defrauding persons of securities. The interest of commerce requires, that *bonâ fide* and real holders of bills, known to be such by those

with whom they are dealing, should have no difficulties thrown in their way in parting with them. But it is not in the interest of commerce, that any individual should be enabled to dispose of bills or notes, without being subject to inquiry."

Bayley, Justice, states: "I agree that the way in which my lord chief justice put this case for the consideration of the jury, by asking what would be the case, if a man were to put over his shop, ' bills discounted for strangers, if they have good names on them, without any questions being asked,' was a very strong way of putting the case for their consideration." The opinion delivered by the chief justice was fully concurred in by the other judges.

In *Snow* v. *Peacock* cited, in the Common Pleas, the rule in *Gill* v. *Cubitt*, was recognized and acted upon as the only safe rule. The question was, whether the defendants were liable to the owner of a bank note, they having taken it from a stranger, without any further inquiry than merely asking his name,—Best, Chief Justice, said to the jury : "The question for your consideration is, whether the defendants, in this case, took the note in the usual course of business; for the course of business must require, in the usual and ordinary manner of conducting it, a proper and reasonable degree of caution necessary to preserve the interests of trade."

In the case of *Vairin* v. *Hobson*, 8 L. R. 55, Mathews, Judge, in delivering the opinion of the court, states: "As to the second question, it has been ruled by late decisions in the tribunals of England, that the payment of a valuable consideration is not alone sufficient evidence of good faith and fair dealing in the purchaser of such an instrument. In addition to this fact, he must show that due diligence was used by him, to ascertain the character and standing of the person who offers it for sale or discount. He must examine into probabilities as to the means by which the person got possession, and if there exist any circumstances in relation to the manner of bringing a paper of this nature into market, calculated to raise suspicions in the mind of a man of ordinary prudence and discretion, the purchaser or acquirer, although for a valuable consideration, will obtain no better title than that which his immediate transferrer had. *Gill* v. *Cubitt* and *Down* v. *Halling*, 3 and 4 Barnwell and Cresswell, pp. 466 and 330. The principles recognized in these decisions, we believe to be just and reasonable, when the vendor is unknown to the purchaser, and imposes no improper restraints calculated to impede a fair and honest circulation of negotiable paper in furtherance of trade and commerce."

In the case of *Nicholson* v. *Patton*, 13 L. R. 216, where the clerk of a notary took a note from his office and pledged it to a broker, Rost, Judge, said : "The fact of the loss being proved, the defendant must show that he came into possession of the note in the regular course of trade, and that he acquired it in good faith and for a valuable consideration, for we take the rule, as settled in England, in the case of *Gill* v. *Cubitt*, as our guide."

We do not understand this rule at all relaxed, by the decision in the case of *Beale* v. *Wilcox*, 3d Ann. 405. We think it has been universally acquiesced in and acted upon by our courts, in cases of lost or stolen bills, and that its operation has been most salutary in preventing frauds, by imposing proper obstacles to their circulation. C. C. 3473. *Little* v. *Citizens' Bank*, 2d Ann. 978. That article of the code provides, that if the possessor of the thing lost or stolen, bought it at public auction, or from a person in the habit of selling such things, the owner cannot obtain restitution of it without returning to the purchaser the price it cost him.

There is nothing in evidence respecting the person from whom the plaintiff bought the bill, or what passed between them at the time, so that the case rests on the naked fact admitted, that the person was unknown to the plaintiff, and a stranger, and that he took the precaution of requiring the signature of *Payne* and *Harrison* on his check. Had the bill been lost or stolen, we do not think the plaintiff could stand justified in law in discounting it. Under these decisions, we think, he would have been liable to the real owner of the bill.

We think, therefore, that the plaintiff cannot be considered as taking this bill in the usual and ordinary course of business, not having exercised a proper and reasonable caution respecting the person offering it. In relation to the plaintiff's conduct in taking the bill as a matter of business, it can make no difference whether the bill was lost, stolen or forged; in all the cases the standard is the same. It is proper to observe, that the check was not drawn according to the usual habit of the plaintiff, as testified to by *Cazenave*, his book-keeper; that is, it was not made payable to the order of the person for whom it was discounted. He was a person unknown, and no relations are proved to have existed between *Payne* and *Harrison* and the plaintiff, except that growing out of their forged names as acceptors of the bill.

It is said, however, that the plaintiff, in making his check payable to the order of *Payne* and *Harrison*, did what he had a right to do, and that the defendants have no right to complain of it. But it being conceded, that extraordinary neglect on behalf of the plaintiff, calculated to mislead the bank and facilitate the commission of the forgery, would absolve the bank from responsibility in paying the forged check; an act, deliberately done, having the same effect, ought to carry with it the same consequence, unless in conformity with the usual course of business between the customer and the bank. The making his check payable to parties whose names are forged as acceptors on the bill discounted, was not, as we have seen, in conformity with the plaintiff's mode of doing his own business, still less has it been shown to have been in conformity with the usual course of business between him and the bank.

We think it cannot be denied, that this check was the implement of fraud, placed by the plaintiff in the hands of a party who had every interest to make use of it against the bank. The genuine signature of the plaintiff to the check, was calculated to mislead the bank, and it certainly facilitated or provided the means of the commission of the forgery. The unknown person, who got the check, was the forger of the bill, or his accomplice. The only obstacle to the accomplishment of the object of the crime, was the required signature of *Payne* and *Harrison*, which had been already forged on the bill. Would he, who had forged their names once and imposed them on the plaintiff, hesitate an instant in repeating the act?

We look in vain for any plausible ground, on which the act of the plaintiff in giving the check in this form, can be held to be consistent with his relations with the bank. There is a great difference between the merchant who pays his bills or acceptances, and the discounter who pays them in market. The former gives such a direction to his money, by drawing his check to the order of another person, as may ensure its reaching the real creditor. He draws his check in favor of the payee of a bill, or of a known third person, when the person presenting the bill is unknown. The responsibility of determing the genuineness of the signatures, is thrown upon the bank who undertakes to pay checks to order. But very different is the situation of the discounter, upon whom the law imposes more caution, in his relations with the bank. What

bank would deal with one who should assert the right of buying bills from unknown persons, without inquiry, and throw upon the bank the responsibility of determining the genuineness of the signature, he should interpose between himself and the loss by forged bills? The signature interposed, is the protection he makes use of to save himself from the consequence of the neglect of that care and caution, in taking bills from strangers, which the law imposes on him. It seems to us obvious, that he, being bound to exercise caution in the first instance, is not permitted to impose any responsibility on the bank, by any signature he interposes, to save himself from a loss which ordinary caution might have prevented.

This mode of drawing his checks, is stated in the printed argument of the counsel for the plaintiff, as a matter of usual precaution on his part, and it is said that the evidence establishes extreme and usual caution, which a long course of business had made familiar to the bank. We have looked in vain for the proof of any recognition on the part of the bank, of any mode of dealing like that in the present case.

The plaintiff required the signature of *Payne* and *Harrison*, as a matter of precaution; against what? Against the forgery, loss, or theft of the bill. But is a discounter to be heard, when he avows that he buys bills under circumstances which induce him to take precautions against their being forged? If a doubt exist in his mind as to its genuineness, can he take the bill and impose the responsibility resulting from its being forged, on another party with whom he deals. We think this mode of doing business, would be fatal to the best interests of commerce, and destructive of those principles upon which alone it can be maintained.

If there was any necessity for precaution, why was it not exercised before the bill was bought. If the title of the holder, or genuineness of the bill was questionable, or not recognized, why were not *Payne* and *Harrison* applied to in order to ascertain it? The delay of a few minutes could have removed the doubt. The making the check payable to *Payne* and *Harrison*, is entirely unmercantile and irregular. Had they been applied to, to endorse the check of a broker, their impression would have been one of surprise, and the request would be scarcely heeded. Why should they put their names out to a person they did not know? Or guarantee the payment of a check, which in no way concerned them?

In conclusion, we think that, notwithstanding the gross neglect of the bank in paying the check, the first fault was committed by the plaintiff, in taking the forged bill. Whenever a forged bill is in circulation, the loss must fall on some one, and, we think, that in law and in conscience, the plaintiff ought to bear it in the present case.

It is therefore ordered, adjudged and decreed, that the judgment of the court below be reversed; and judgment is rendered for the defendants, with costs in both courts.

PRESTON, J. *Smith* discounted a supposed draft of *Ventriss*, of Donaldsonville, on *Payne* and *Harrison*, merchants of New Orleans, and purporting to be by them accepted. It turned out that the name of the drawer, a planter, as well as the name of the acceptors, was forged. It was presented by a stranger, no doubt the counterfeiter, to whom he gave a check on the Mechanics and Traders' Bank, in favor of *Payne* and *Harrison* for the proceeds. By a forged endorsement of their name, the amount of the check was drawn from the bank, and *Smith* sues for the balance of his account, without deducting the check.

If the defendants are liable at all, it is either for negligence in paying out the plaintiff's money on a forged endorsement, or absolutely, whether negligent or not, because they paid out his money deposited with them, to other persons than those to whom he ordered payment.

On the score of negligence, *Smith* was more in fault than the defendants. He gave out his check on the forgery of the name of the drawer and of the acceptors of a draft. The name of those acceptors, alone, was counterfeited on the back of his check, and deceived the defendants. He had the time and leisure to discover the reality of the transaction, and should have used both, before giving his check on a double forgery. It could have been done by stepping to the counting house of the acceptors, probably but a few squares from his office. The paying teller of the bank, seeing his well known name to a check in favor of, and endorsed by a well known house, might easily be led, by his signature, into the error of taking for granted that the whole was genuine. He had no leisure to go out to verify the signature of the acceptors, but was confined to his counter. Checks, it is a matter of notoriety, are constantly pouring in upon the paying tellers of our few remaining banks. On the score of negligence, *Smith* was most in fault, and might well excuse that, in defendants, of which he himself was doubly guilty, with far more facilities of avoiding its effects. Where two parties are equally guilty of negligence, he who suffers loss, must bear it, and neither can recover from the other. 3 Bur. Rep. 1354. 1 Black. 390. 2 T. Rep. 70.

But the main ground of the plaintiffs' action is, that he ordered the money to be paid to *Payne* and *Harrison*, and that the bank paid it to other persons. The fallacy of the argument in support of this ground, consists in this, that having given out his check, it was immaterial to *Smith* to whom the money was paid. His check being out, the money he deposited in bank, to the amount of the check, was no longer his; he had parted, for its supposed value, with all his interest in the check, and the money it represented. That the holder, perhaps an innocent holder of the check, drew the money, was no injury to him; the injury to him was done before by the counterfeiter, in imposing a forged draft upon him.

The money in bank belonged to the holder of the check. It was in the power of the holder to go to *Payne* and *Harrison*, and give it in payment of a debt, or purchase goods with it, or obtain its discount, and the check would have thus become theirs, also the money in bank, and the transaction binding upon *Smith*, beyond a doubt. He thus put it into the power of the counterfeiter, to dispose of his check and money. It was his business, to stop the payment of the check, and to regain it, before it got into the possession of an innocent holder, and his misfortune and loss, if he failed to do so.

For, in fact, *Smith* did not order the money to be paid to *Payne* and *Harrison*, but, through them, to the counterfeiter. He gave his check, which represented his money, to the counterfeiter, for a draft-supposed to be genuine, and not to *Payne* and *Harrison* with whom he had no transaction, and who would not have endorsed, or incurred any responsibility with regard to it, until it became theirs, by some transaction with the holder. And therefore, as well observed by the counsel of the defendants, no action can be found in the books, in which the drawer of a genuine check, has recovered its amount from a banker on account of a negligent payment of the check. If made payable to the order of the payee, the right of action belongs to him, for the payment on a forged endorsement; but in no case has such a right been claimed by the drawer of the check.

The paying teller of the bank, so far as *Smith* was concerned, was bound to know only his signature. The bank was the depository of his money, and bound to pay it on his check, which was genuine. As to him, the bank was not bound to send out and ascertain the genuineness of the signatures of the endorsers of his check. They were required to do so, to secure themselves from liability to the endorsers alone. The bank was bound to know the genuineness of the signature of *Payne* and *Harrison* only, at the risk of being liable to them, and not to *Smith*.

It is not pretended that *Payne* and *Harrison* have any right of action against the bank. If they had, it is their right of action, not the plaintiff's. The drawer of a check has never recovered from the banker, unless his name was forged; or, as in the case of *Hall* v. *Fuller*, where the amount for which he checked, was altered from £3 to £330, and the last sum was paid by the banker. He checked for £3, and was to be charged with that sum, and not £330, for which he did not check. But he is to be charged with the sum for which he actually checked, unless there be greater negligence, in paying it, than that of which he was himself guilty.

*Smith* had no suspicion of the genuineness of the transaction with the stranger; for then, it would have been his duty, in order to recover, to have communicated his suspicion, to the bank, and stopped the payment of the check; and he could not use the name of *Payne* and *Harrison*, to impose on the bank a risk he was unwilling to incur himself. He had no transaction with *Payne* and *Harrison*, which authorized him to use their name as payees of the check. The use of it was fictitious as to them, and fictitious as to the bank, and can give him no rights which he would not have had, if the check had been made payable to bearer, or to a fictitious person; in which case, it is admitted, he could not recover the money paid on the check from the bank.

It does not appear, to me, to be in the ordinary course of business, to make a check payable to a payee with whom we have no business transactions, and on that account, *Smith*, and not the bank, should bear the loss. The case should be likened to a check to the order of a fictitious person, which has often been held to be the appropriation of so much money to be charged to the drawer, and credited to the account of the holder of the check, or bill, as the case may be. Both are out of the ordinary course of business, and should expose to loss only the author of the fiction, if there be reasonable care on the part of the other parties to the transaction. In fact, courts should encourage only real, and not fictitious transactions, which are so liable to give rise to losses.

It has been urged, that if I give a check to a tradesman for goods, payable to his order, and it is paid without his order, I can recover the amount from the banker. I think not. The tradesman took the check in payment of his goods, and I was discharged from his bill; my genuine check was charged to my account, and I could only claim the balance of my deposit. The tradesman could sue the bank for the amount of the check, because the money belonged to him, as holder of the check, and was paid, without his order, on a forged endorsement. But having paid my bill with the check, and got my discharge, I can have no such right of action.

I am of opinion, for these reasons and those given by the chief justice, that the judgment of the district court, should be reversed, and judgment rendered for the defendants, with costs.

SLIDELL, J., dissenting. The facts out of which this suit has arisen, are as follows: On the 7th of November, 1850, a person unknown to *Smith*, who is a

money broker, offered to him for discount, a bill of exchange for $3000, at ninety days after date, purporting to be drawn at Donaldsonville, November 5th, 1850, by *W. C. S. Ventriss*, in favor of *W. P. Goddard*, and by the payee endorsed, upon and accepted by *Payne* and *Harrison*, of New Orleans. It is admitted, that the names of the drawer and acceptor are forged. *Smith* discounted the bill, and gave his check for $2908 67, on the Mechanics and Traders' Bank, payable to the order of *Payne* and *Harrison*. The check was paid at the bank on the same day, to an unknown holder, the name of *Payne* and *Horrin* (or *Horrim*) being written thereon. Both the acceptance of the bill, and the endorsement on the check, are proved, by a member of the house of *Payne* and *Harrison*, to be forgeries. *Payne* and *Harrison* are not customers of the bank; but, being a prominent house, they pay, as testified by one of the house, large amounts of their discounted and collection paper in that bank. It is in evidence, that *Smith* had been for many years a customer of the bank, and was in the frequent habit of drawing his checks to order, when he discounted mercantile paper. The motive would seem to have been, (though there is no admission or direct proof as to this particular case,) to guard against any want of title on the part of the person getting the discount, by making it necessary for him to go to *Payne* and *Harrison*, and get their endorsement. That *Smith* had doubts whether the acceptance was genuine, is quite improbable, considering he took it at a rate which is not pretended to be unusual. It is proper to add, that the appearance of the bill, which has been exhibited to us in the original, is not suspicious. The body and signatures, it seems to me, have a free and genuine character to one not acquainted with the handwriting of the parties. We may here observe, as a matter not proved in this case, but familiarly known to those who are acquainted with the daily course of business in New Orleans, and frequently shown by our own records, that money is raised, by or for the planter, through the accommodation acceptance of his factors, discounted in the New Orleans market; or the planter gives such bills for purchases, at his plantation, of western produce, pork, corn, horses, &c., from the passing flatboatman or drover. The acceptor, himself, is sometimes the party who gets the acceptance discounted, and puts the proceeds to the planter's credit in account.

The question we have to decide is, whether the bank has a right to charge *Smith's* check, so issued and paid, to his debit in account. The district judge has decided in the plaintiff's favor, and the bank has appealed.

It is said, that *Smith* committed the first fault in permitting himself to be imposed upon for want of proper previous inquiry; that he gave this stranger the means of imposing upon the bank, by the forged endorsement of a house whose signature was not in the bank; that he is a broker, who receives propositions at his leisure, can tell the applicant to call again, and meanwhile inquire; that the paying teller is confined to his counter, and having a great press of business, cannot stop to verify every signature, and is only bound to know that the drawer's name is genuine.

Some of these propositions are certainly not without force; but, it seems to me, that they cannot control the case, when we analyze the nature of the contract between the bank and *Smith*. What was it? The defendant agrees to receive his money on deposit, which is an advantage to the bank, because it has the use of the money, the deposit not being special; and agrees to pay it out as he may order. Now, here *Smith* ordered the bank to pay the sum to *Payne* and *Harrison*, or their order, to be shown by their endorsement. But the bank

SMITH<br>v.<br>MECHANICS<br>AND TRADERS'<br>BANK.

has not paid it to *Payne* and *Harrison;* but has paid it to some one without their endorsement, and upon an endorsement which does not even purport to be theirs. The duty, therefore, which the bank, for a valuable consideration, undertook to perform, has not been fulfilled. Instead of paying as he directed, it has paid against his directions; and my brethren, as I understand, all think that in the payment of this check, "there was gross negligence on the part of the clerk of the bank."

As long as *Smith* kept himself within the terms of his contract with the bank, they would seem to have no right to inquire into, and find fault with his reasons for drawing the check to *Payne* and *Harrison's* order.

*Smith* had no intention to do the bank an injury in the course he pursued; he merely used the right given to him, under his contract with the bank, for his own protection. If the bank had fulfilled its duty, by requiring a genuine endorsement, the guilty person would have been foiled.

The precaution taken by the plaintiff is not unusual. People frequently do it, without intending any wrong to the banks, or any idea that they are doing an act of which the propriety could be questioned. A person, for example, whom you do not know, brings you a tradesman's account, which you pay by check to the tradesman's order, thus guaranteeing yourself that the check must go into his hands, or else not be paid, and so you cannot be defrauded by a person untruly representing himself as the tradesman's clerk. A business man would hardly say, that this was negligent or wrong.

My impression is, that it is not unusual among merchants, if a stranger presents a bill of exchange for payment, to ask him, if he is acquainted with any respectable house or person, and if he names one, to give him a check to the order of such person or house. We are not informed, by the evidence, what passed between *Smith* and this stranger, and cannot know, since *Smith* could not offer himself as a witness; and no one else appears to have been present. For aught we know, *Smith* may have put this question to the stranger, and the check thus have taken the form it presents; or *Smith* might have supposed the person sent by the acceptors to get the bill discounted. We are not to presume bad faith on *Smith's* part.

The learned counsel for the defendants, has asked us to apply to this case, the well settled rule respecting fictitious payees, to wit, that if a bill or note import to be payable to a person not *in esse,* or his order, and is issued with an endorsement, in blank, purporting to be made thereon by *him,* it is, as against the drawer or maker, to be considered as a bill or note payable to bearer; and so is a bill as against the acceptor, if he knew, at the time of his acceptance, that the payee was a fictitious person. But this assumes that *Payne* and *Harrison* were fictitious payees. On the contrary, they were persons *in esse,* and the plaintiff intended that the stranger, who negotiated their acceptance, should go to them and get their endorsement.

It is said, there is no case in the books where the drawer has recovered, when the bill has been paid on a forged endorsement, and that *Payne* and *Harrison* are the only persons who could maintain an action against the bank. The reason why the books do not show such actions, is because the payee or endorsee, whose endorsement has been forged, is generally the party who, having been the holder of it, has lost its possession by accident or theft, and so has suffered the loss. But here *Payne* and *Harrison* never owned the check, but were merely intended by the drawer as intermediaries through whom the check should pass. The testimony of one of their house shows, that the only lawful

interest is in the plaintiff, and, of course, by their intervention through one of their own house as a witness in this cause, they would be estopped from ever making any claim against the bank.

Without being considered as expressing a positive opinion upon the point, I think it proper to add, that I am not prepared to say, that if the bill had been a genuine bill, which had been lost or stolen, and got unlawfully into the possession of this stranger, the true owner could have recovered the bill from *Smith*, upon the evidence we have before us. See the cases and authorities cited in *Wilcox* v. *Beal*, 3d Ann. 407.

In the case of *Beal* v. *Wilcox*, we said, that we did not consider it necessary under the facts of the case, to say, whether we were prepared to go to the full extent of the doctrine recognized by Mr. Story and in the English courts. We, however, noticed in that case, the opinion of that author, and the present condition of the law in England. It is not improper to refer to them again.

In his Treatise on Bills, § 194, Mr. Story observes : "For a considerable length of time the doctrine prevailed, that if the holder took the bill, under suspicious circumstances, or without due caution and inquiry, although he gave value for it, yet he was not to be deemed a holder *bonâ fide*, without notice. But this doctrine has since been overruled and abandoned, upon the ground of its inconvenience, and obstruction to the free circulation and negotiation of exchange and other transferable paper."

In the note to be found in the forty-fourth lecture of Mr. Kent, edition of 1844, are the following remarks : " In *Backhouse* v. *Harrison*, 3 Neville and Mann., 188, the case required the endorser, who lost his bill by accident, to show, in his defence, gross negligence, imputable to the holder, in order to impeach his title. The same principle was followed in *Cook* v. *Jadis*, 3 Neville and Manning, 257. 2 Mylne and Keene, 638. *Goodman* v. *Harvey*, 6 Neville and Manning, 372 ; so that the case of *Gill* v. *Cubitt* seems to be somewhat weakened, if not destroyed, as authority."

In *Goodman* v. *Harvey*, 4 Adol. and Ellis, 877, Lord Denman uses the following language : " The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion, that gross negligence only would not be a sufficient answer, where the party has given consideration for the bill. Gross negligence may be evidence of *mala fides*, but is not the same thing. We have shaken off the last remnant of the contrary doctrine, where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title. The evidence in this case, as to the notarial marks, could only weigh as rendering it less likely that the bill should have been taken in perfect good faith." In that case, we find Sir John Campbell admitting in argument, that " it can no longer be maintained as law, that the holder of a bill is disabled from recovering it, if he has taken it under circumstances which might reasonably have awakened suspicion," but, he contended, that there had been gross negligence, having the effect of fraud.

In *Ulher* v. *Rich*, 10 Adol. and Ellis, 784, Lord Denman observed : " With respect to the doctrine laid down in *Gill* v. *Cubitt*, 3 B. and C., 466, and other cases, we adhered to the more recent decisions, and to what is said in *Goodman* v. *Harvey*, 4 Adolp. and Ellis, 870, that gross negligence alone would not be a sufficient answer; that it may be evidence of *mala fides*, but is not the same thing. It follows, that the pleading *mala fides* must be distinctly alleged, and the sole question is, whether *mala fides* is alleged by the words, that " the plaintiff was not the *bonâ fide* holder of the bill.

79

SMITH
*v.*
MECHANICS
AND TRADERS'
BANK.

This case certainly shows that banks, by permitting their depositors to draw checks to order, expose themselves to an increased responsibility ; but if they do not choose to take deposits on those terms, it is in their own power to remedy the inconvenience by requiring their customers to draw their checks to bearer.

I think, the judgment should be affirmed.

---

## SAME CASE—ON A RE-HEARING.

THE judgment of the court, on a re-hearing, was pronounced by

ROST, J.   In the petition for re-hearing in this case, numerous precedents are cited, defining the duties and obligations of a bank towards its customers, and the learned counsel attribute their want of success to the neglect, on their part, to give us the benefit of them in the original argument.   They do themselves great injustice ; the court is familiar with those precedents and acknowledges their authority ; but the court is aware also, that the contract of bank deposit is, to some extent, one of mutual benefit, and that the duties and obligations it creates are not all on the side of the bank.   It imposes some duties on the depositor, and the first of those duties is, that his dealings with the bank, be direct and and founded on truth.   The violation of this duty by the plaintiff, in this case, would alone have been sufficient to defeat his action, on the ground that he cannot increase the obligations of the bank, by creating a state of things which would not have existed, if no indirection had been resorted to by him.

Had *Payne* and *Harrison* been the real payees, the negligence of the bank might have brought the case within the rule invoked in behalf of the plaintiff. It is the circumstance of his buying a forged bill from a person unknown, without inquiry, and giving him in payment a check made payable to the order of a third party, who had no interest in the transaction which distinguish this case from those cited, and bring it within the operation of other and adverse principles. As the opinion of the court has been greatly misunderstood, it may be well to make this distinction more obvious by an example.

It is customary, in this place, when merchant's or tradesmen's bills are presented by a person unknown to the debtor, to give checks to the order of the creditor, upon an acquittance of the bill; as long as the banks submit to that custom, they take upon themselves towards the payee, the risk that the money shall reach him, and if it does not, there may be such gross neglect on the part of the bank, as would render it liable also to the drawer of the check, if he should have to pay the debt a second time.   The reason is that, in all such cases, the party named in the check, is the real payee, and the drawer has merely exercised his right as depositor ; here the nominal was not the real payee ; the check was given in payment to the creditor, though in the name of another person, and the bank paid that creditor.   Taking the facts as they were before us, and limiting the decision to the case in hand, we held, that as it was no part of the contract between the plaintiff and the bank, that he should have the right to draw checks in that form.   The bank might go behind the check, and justify the payment, by showing that it had been made to the creditor whom the plaintiff intended to pay.

If the law had been with the plaintiff, it would at least have been incumbent upon him, to make it appear that the loss for which he claims indemnity, was the result of the neglect of the defendant, and could not have occurred, if the

bill had been presented to *Payne* and *Harrison*, for their signature. He has entirely failed to establish that fact.

The plaintiff cannot avail himself of the presumption, that *Payne* and *Harrison*, who were without interest in the matter, would use greater diligence than he did, in ascertaining who the holder of the check was. A person, such as the plaintiff describes him to have been, might easily have found some plausible reason for the check being in that form. *Payne* and *Harrison*, thorough men of business as they are known to be, would then have told him, that they would ascertain whether the bank would pay the check and collect it, if it was good; but that this would give them some trouble, for which they must be indemnified by a small commission for their endorsement. All this would have been mercantile and fair; and yet, who would, in that case, have indemnified the plaintiff for his loss? Not the bank, surely! It would have paid, agreeably to order, not *Payne* and *Harrison*: they would have complied with his wishes, and simply trusted the man, whom he himself had first trusted, and sent to them; to any complaints on his part, on the ground of negligence, they might well answer, that they did not understand his endorsement, as conferring upon them the police of his broker's shop; and that, if it was so intended, it should have apprized them, that they were to take care that his customer was not a forger and a thief.

Suppose that the holder had purchased goods from *Payne* and *Harrison*, and offered them, in payment, a check of the plaintiff to their order; they, undoubtedly would have taken it, after ascertaining that it would be paid. Suppose, that after ascertaining that the check would be paid, *Payne* and *Harrison* had told the payer of the bank, to let the holder write their name on the back of it, for the sake of form, and then pay it; had the name accordingly been written as we find it, and the check paid, it cannot be doubted that the authorization of *Payne* and *Harrison* would have been sufficient to protect the bank. What difference is there, in a legal point of view, between an authorization thus previously given, and the tacit ratification by these parties, of the payment, after it was made? None that we can perceive. The plaintiff, in his anxiety to secure himself, lost sight of the fact, that the additional security obtained by making checks payable to order. is real only when the party to whom the check is payable, is the payee in interest, and that it became illusory when he is not.

The decision of the court places the plaintiff where he would be if he had kept his money in his drawer, instead of keeping it in the bank; and it is repugnant to all ideas of justice, that he should have a claim against the bank, for paying the party whom he would have paid himself, had he been his own banker.

The learned counsel complain that wrong has been done their client, by bringnig his negligence in a transaction with a third party, in which the defendant had no interest or concern whatever, to bear upon a contract between the plaintiff and defendant of a totally different nature; and the execution of which, in no manner depended upon any circumstances that might attend the other. They overlook the fact vital to their cause, that it is the connection between those two contracts, which alone gives the plaintiff, the semblance of a right of action.

Suppose that the bill discounted was genuine, and that in the absence of *Payne* and *Harrison* from the city, the holder had forged their signature to avoid delay, the plaintiff would have received the stipulated consideration of his check. The check would have been paid to the owner of it, and *Payne* and *Harrison* are satisfied on that hypothesis. Where is the injury resulting from the alleged gross neglect of the bank? And who has any right of action against it? It cannot be fairly

SMITH<br>*v.*<br>MECHANICS<br>AND TRADERS'<br>BANK.

SMITH
*v.*
MECHANICS
AND TRADERS'
BANK.

maintained that the payment itself caused any injury to the plaintiff; his loss was the consequence of his taking a forged bill; and unless he connects this transaction with his contract as depositor, he has nothing whatever to stand upon. With this connection he has little more, as either in law or in good conscience, the bank cannot be charged with the consequences of his own neglect.

The true principle on which the decision is based, is one which the nature of the business before our courts has rendered more familiar to the profession, than any other in jurisprudence. It need only be named to be recognized and assented to.

Whatever object the plaintiff may have had, in making the check payable to *Payne* and *Harrsson*, as they were not the real payees, the insertion of their name was, between the parties to the contract, a simulation. The bank who was not a party to this simulation, has paid the party for whose benefit the check was given, and claims to be a creditor of the plaintiff for the amount. The principle of the decision is, that being thus situated, the bank may show the simulation of any act by which the plaintiff attempts to frustrate its just rights; that it may remove the cloud which conceals the contract between the plaintiff and the holder of the check, and justify the payment, by showing that it was made to the real creditor.

The law abhors simulation; and if there is a point settled by our jurisprudence, more conclusively than any other, it is, that except between the parties to it, it has no existence, and that any third person having an interest, may at all times and in all forms of action, call upon the court to disregard it, and adjudge his rights according to the truth which it disguises. In the very first case of simulation, which came before this court after its organization, we held, contrary to the opionion of our predecessors, that property held under simulated contracts may be seized by the creditor of the vendor, as if the simulated conveyance did not exist. We have adhered to this rule in many cases since, and we are satisfied that no other decisions made by us, have been productive of more good, or more generally approved; on the ground of simulation, the case is clear against the plaintiff. *Bernard* v. *Auguste*, 1st Ann. 69. *Cammack* v. *Watson*, Ib. 132.

The fact that the signature of *Payne* and *Harrison* on the check, is a manifest forgery, is immaterial; if there had been no endorsement at all, the bank, after payment, would not have been debarred of the right of proving the simulation, and of showing that the payment was made to the real creditor. We have examined the case on the supposition, that the check was paid to the party who received it from the plaintiff. It would perhaps be more favorable to the defendant, if the check had been transferred to a third person, in good faith.

It is said that the decision is calculated to encourage forgery; believing it strictly legal, we would not be responsible for the consequences, if it was; but we rejoice in the belief, that its effect must be directly the reverse. We cannot but know as men, if not as judges, that it is not the first time, that forged paper has been discounted by brokers in this market, and we could devise no surer means of encouraging the practice, than making a decision which would, in all cases, place the banks between the discounter and the danger arising from forgery. The moral tendency of the decision cannot be questioned; it puts down indirection, vindicates the cause of truth, and is in furtherence of the principle too often overlooked : that the law of commerce is the law of honor.

The re-hearing refused.

PRESTON, J.  The plaintiff insists, in his petition for a re-hearing, that his negligence, in a transaction with other parties, should have no influence on his claim against the bank, for gross negligence in paying out his money without his order.  I was not, and am not satisfied by the testimony, that there was gross negligence on behalf of the bank.  A partner in the house of *Payne* and *Harrison*, whose signature was forged, states it was a bad forgery.  It may have appeared so to him, being the forgery of his own signature, but not to others.  The testimony makes out a case of ordinary negligence; and as *Smith* is proved to be a very careful man, his negligence in being deceived by the same forgery, was alluded to, as tending to excuse the defendants for less negligence with regard to the forgery of the same signature, than that of which he was guilty himself.

The plaintiff's counsel contends, that the bank had nothing to do with the transaction between *Smith* and the counterfeiter of the draft.  Testimony and admissions were before the court in relation to the whole transaction.  As *Smith* sués the bank for money, the defendants had a right to prove the whole transaction, if they could thereby show that *Smith* had disposed of his money by contract, and had no longer an action against the bank on account of it.  Had the draft and acceptance which he discounted been genuine, *Smith* clearly could not have recovered the amount of the check he gave for the proceeds, although the money had been drawn upon the forged endorsement of *Payne* and *Harrison*.  The law cannot be different, because he discounted and gave his check for a forged acceptance.  In the first case, he gives his check for its full value which he has in hand, and has no action against the bank for its amount; in the last case, he gives his check for and in consideration of his negligence.  He has nothing in hand for it, but a draft, which is worthless.  He must suffer the loss, and cannot throw it upon others.  In both these cases, he gives out his check, and parts with his money by contract; and has no action to recover it back, except against the individual who defrauded him in the contract.  He has no other rights than if he had paid with bank notes.  The bank was undoubtedly his agent to pay out his money; but when, in consideration of a contract, he delivered a check for that money, it was no longer his; and the bank having paid his check, in defence to a suit for the money, had a right to show that he had parted with the money by contract, and that their agency for him had ceased, as to the money for which he delivered the check.

The case has been put of remitting a check, say to New York, to a creditor, or as a gift.  I may make it payable to the order of my creditor or donee; and may sue the banker if it is paid without their order.  The reason is, that the money remains mine, until the delivery of the check to my creditor or donee.  If never delivered, my creditor is not paid, and my donee does not receive the benefit of my liberality.  Therefore, I can sue, if the money is paid before the check comes to the hands of the real payee; for, until then, the creditor, or donee, has their claim upon me.  But as soon as the check reaches the payee, it becomes his property.  I have no longer any interest in it; the forgery of the endorsement is immaterial to me, and I cannot recover on account of the erroneous payment; but the payee can, because the check belonged to him.

So in this case, the check was delivered for the draft.  The transaction was final as to *Smith*, and the person with whom he dealt.  The forged draft belonged to him; the delivered check belonged to the holder.  It was the business of the holder to obtain the endorsement of *Payne* and *Harrison*, and to get

the money. *Smith* had nothing to do with that; and probably took no interest in it, until he ascertained, by its protest, that the draft was a forgery. It is said to be a general custom here, to pay the clerks of merchants for produce or merchandise, in checks to the order of the merchants. If the clerk be unknown, it is a dangerous custom, and should be more honored in the breach than in the observance. But even then it has no bearing on the present case; for I make the check payable to the merchant, because I have had a real transaction with him, and am his debtor, and not the debtor of the unknown clerk. I have a right, therefore, to require of my banker to pay on the genuine endorsement of the merchant with whom I have the transaction, and of whom I am the debtor; and not to pay on a forgery by the pretended clerk. But here the case is exactly the contrary. *Smith* contracted with the swindler alone, and had no transaction whatsoever with the merchants, *Payne* and *Harrison*. Therefore, the statement in the plaintiff's application for a re-hearing, that the stranger represented to *Smith* that he was sent with the draft on behalf of *Payne* and *Harrison*, would not avail him, even if proved. *Smith* was bound to know with whom he dealt; and if he dealt with an agent, to know that he was really the agent, and could not make *Payne* and *Harrison* his creditors, for the proceeds of the draft, without their consent. The stranger having no authority from them, *Smith's* contract was with him.

It is said by the counsel of the plaintiff, in their petition for a re-hearing, that the almost unanimous opinion of merchants and lawyers, is adverse to the decision of the court. The negligence of their client, and of the defendants in this particular case, has given rise to a controversy that has rarely occurred before. It grows out of a payment to a fraudulent creditor, by a check in favor of real persons, with whom neither the debtor nor creditor had any transaction, and who disavow all interest and concern in the matter. It will probably hardly occur again. It requires more reflection on the case itself, to understand and decide it correctly, than persons, having no special interest in the result, can afford to bestow upon it. Further reflection on the application for a re-hearing, has only confirmed me in the correctness of the original opinion of the court.

SLIDELL, J., dissenting. My opinion in this case is unchanged by further consideration of the subject.