TOLEDO, SAGINAW & MUSKEGON RAILWAY CO. v. PETERS.

1. BILLS AND NOTES—BONDS—GOOD FAITH OF HOLDER—EVIDENCE —INJUNCTION—BURDEN OF PROOF.

In a suit to enjoin the enforcement of a railroad bond that defendant claimed to hold in due course, the burden rested on complainant to show that defendant was not a good faith purchaser: evidence that the entire issue of bonds, of which the one held by defendant was a portion, had been recalled, canceled, and destroyed by fire, was insufficient to impair defendant's title.

2. SAME—PRESUMPTIONS.

It is presumed that the person presenting a negotiable bond is a bona fide holder, and until evidence is introduced tending to show that it was lost or stolen before

he acquired it, or that the consideration for the instrument was illegal, or that the issuance or transfer was induced by fraud, no obligation rests upon him to prove that he is a holder in due course.

Appeal from Wayne; Mandell, J. Submitted April 22, 1913. (Docket No. 107.) Decided September 30, 1913.

Bill by the Toledo, Saginaw & Muskegon Railway Company against Charles Peters for an injunction to restrain an action at law on a negotiable instrument. From a decree for complainant, defendant appeals. Reversed.

*L. C. Stanley,* for complainant.

*George W. Bates,* for defendant.

MOORE, J. This bill was filed to enjoin the prosecution of a suit brought to recover upon seven interest coupons amounting to $225, which coupons were attached to a railroad bond for $1,000. Said suit was commenced in April, 1908. From a decree in favor of the complainant, the case is brought here by appeal.

Stated in the narrative form, the averments of the bill are, in substance, that in November, 1886, the complainant issued 1,600 bonds of $1,000 each, secured by mortgage, said bonds bearing 6 per cent. interest, payable semi-annually, the interest payments being evidenced by coupons, said bonds being due November 1, 1926; that in 1888 they were delivered to W. V. McCracken & Co., who had the contract to build complainants' road for the purpose of paying them for the labor and material in building the road.

"Your orator is informed and believes that said McCracken & Co. did not sell or dispose of any of said bonds and did not sell or dispose of bond No. 1401, hereinafter mentioned, or any of its coupons, with

the possible exception that said McCracken & Co. did pledge some of said bonds, what bonds your orator is not now informed; but your orator is informed and believes that if any were so pledged, they were redeemed, together with all coupons, and that shortly before the 9th of August, 1888, said W. V. McCracken & Co. were in possession of said entire issue of 1,600 bonds, including bond No. 1401, hereinafter mentioned, and all coupons pertaining thereto."

It is averred: That an arrangement was made by which these bonds were all to be canceled and an issue of 5 per cent. bonds made to take the place of them. That they were all taken to New York and burned, as complainant believed, and, after that fact was established to the satisfaction of complainant and the Grand Trunk Railway Company of Canada, 1,734 new bonds of $1,000 each, bearing 5 per cent. interest, were issued, and 1,560 of them were delivered to W. V. McCracken & Co. in lieu of the 1,600 bonds before mentioned and the remainder delivered to the Grand Trunk Railway Company of Canada. That complainant rested in the belief that all of said first issue of bonds had been destroyed, until April, 1906, when a firm of brokers in New York demanded payment of the interest coupons on bond 1401, which bond was later sued as before stated; that other coupons will be sued and perhaps the bond itself.

An averment is made that complainant has a defense in equity for several reasons, the last of which is stated as follows:

"Because under all the circumstances the said bond 1401 could not now be in existence except for some fraud on the part of some of the clerks of said trust company in handling them at the last when they were being counted or being taken to the said furnace for destruction by burning, or else could not now be in existence except for an accidental loss of the same, or purloining of the same, or other fraudulent means, of which your orator has no knowledge."

Then followed a prayer for an injunction and for general relief. Accompanying this bill of complaint was an affidavit of the taking of the first issue of bonds to New York, and their delivery to a trust company for cancellation.

"That deponent delivered into the hands of the aforesaid the bonds so carried by him, and they were counted from deponent's hands and found to be the complete lot of 1,600 bonds as aforesaid, with all coupons. That after being so as aforesaid counted and checked by the said officers of said company or by clerks of said company, and in the presence of deponent, they were carried down to the furnace in the basement of the building wherein were the offices of said trust company (that is to say, from the ground floor to the basement one story below), being carried downstairs by one or more clerks of said trust company, and were there in the presence of deponent and said clerks burned in said furnace; that to the best of deponent's knowledge and belief the bond 1401 mentioned in said bill was then and there burned with the rest. And deponent believed it to have been so burned under his eyes and in his presence until the year 1906, when he learned of the claim being presented against said railway company by one claiming to hold said bond 1401.

"Deponent further states that the only explanation he can give for the said bond 1401 not having been destroyed, if it was not destroyed with all its coupons, is either that it escaped from the fire and went out at the chimney in the draft and was picked up by some one who had no right to it and thus got to the hands of the present holder, or else that it was purloined by one or more of the clerks taking it to the furnace to be burned."

The defendant answered the bill of complaint and among other things averred:

"But the defendant alleges and so states the fact to be that the said bond No. 1401 was not so destroyed, and that the same had been negotiated and subsequently came into the hands of defendant who is now the bona fide holder and owner of the same for

value. * * * That the defendant admits that the said complainant will not be able to show that either said bonds, including bond No. 1401, or any of said coupons were not signed by or on behalf of the said complainant; that the defendant submits that the reasons contained in the eleventh paragraph of said bill as a defense in equity to the rights of this defendant to recover in the said action at law now pending are wholly ineffective and insufficient, and that as a bona fide holder of said bond No. 1401 and the coupons thereto attached for a good and valuable consideration paid therefor he has a legal and valid right to maintain such action and recover therein the amount due on said coupons, and that by reason of the same the said complainant cannot successfully defend the said suit at law now pending against it.

"And the defendant also submits that the facts set up by the complainant in its said bill so disclosed and that all and every matter mentioned and complained of are matters in respect to which said complainant is not entitled to any relief from a court of equity, and this defendant hopes that he will have the same benefit as if he had demurred to the said bill of complaint."

A hearing was had in open court, and the first witness produced the discharged first mortgage and a letter from the trustee, reading as follows:

"DETROIT, Aug. 1, 1888.
"THE AMERICAN LOAN & TRUST COMPANY, OF THE
    CITY OF NEW YORK.
"Gentlemen:
"The undersigned are trustees in a mortgage executed by the Toledo, Saginaw & Muskegon Railway Company, bearing date the 2d day of July, 1888, and in the bonds secured by the mortgage in the amount of $1,734,000. It appears that a prior mortgage to this was executed by the railway company to you as trustees, to secure an issue of bonds, dated November 1, 1886, in the amount of $1,600,000. The bonds under this last-named mortgage, it is said, have not been sold, but have been pledged as collateral security for money loaned. It has been arranged between the railway company and W. V. McCracken &

Co., who own the bonds issued and outstanding under your mortgage, that these bonds shall be retired by the substitution of bonds issued under the mortgage in which the undersigned are trustees. This has been duly authorized by resolutions of the board of directors of the company, and will be sanctioned by the written authority of McCracken & Co., which will be given to you. To effect such retirement, $1,560,000 of the bonds of our mortgage are available, and are to be placed in your possession concurrently with this letter, but on the following conditions and understanding, to wit: That you are to use the bonds ($1,560,000) to retire and secure possession of all the bonds of your mortgage issued and outstanding. Having thus retired and secured possession of the bonds last named, you are to cancel them in the presence of at least one of the undersigned and at once destroy them. You are thereupon to execute a discharge of said mortgage of November 1, 1886, and have the discharge duly recorded in the several counties into or through which said Toledo, Saginaw & Muskegon Railway runs. The remainder of the $1,-560,000, if any shall be left in your possession, are to be delivered to W. V. McCracken & Co.

"Concurrently with the receipt by you for cancellation of the bonds secured by the mortgage of November 1, 1886, you will receive from W. V. McCracken & Co., certificates of the capital stock of said railway company in the amount of $1,600,000, and the understanding is that you will deliver this stock to said James H. Muir, treasurer, duly transferred as he shall direct."

A certificate from the American Loan & Trust Company was introduced, stating that the 1,600 bonds had been destroyed by fire. Two affidavits of date August 9, 1888, to the same effect were introduced in evidence. The deposition of Mr. Berry was offered. In it appeared the following:

"*Q.* What did you do, if anything, about these bonds about the 9th of August, 1888?
"*A.* They were cremated.

177 MICH.—6.

"*Q.* When, where, and how and by whom were they cremated?

"*A.* They were put in a furnace by Mr. McCracken, the president of the railway company, and myself; that is, we were present when they were put in and saw them burn.    *    *    *

"*Q.* Mr. Berry, what was the issue of these bonds?

"*A.* One to 1,600, inclusive.

"*Q.* What did you do yourself, Mr. Berry, with reference to ascertaining the numbers?

"*A.* Well, the custom always has been to count the bonds one by one, and also count the coupons then belonging to that particular bond. (Mr. Brinckerhoff asked to have answer stricken out as irresponsive.)

"*Q.* Was the process ever done by one person?

"*A.* No, sir; two persons have always done this.

"*Q.* In response to the question, Mr. Berry, what was done on that occasion with reference to the corporation or any other individual.

"*A.* Mr. McCracken, president of the railway company, represented the railway company and was one of the parties who counted the bonds.

"*Q.* In your presence?

"*A.* In my presence, and I call to mind that there was another, a workman, also present.

"*Q.* Of the railway company?

"*A.* I think he was of the railway company.

"*Q.* Was his name Muir?

"*A.* I think it was Muir.

"*Q.* Mr. Berry, do you recall whether I was present?

"*A.* Yes, sir; you were.

"*Q.* Was I the one who brought the issue to the trust building?

"*A.* I do not remember.

"*Q.* Did you say you burnt the bonds yourself?

"*A.* No, sir.

"*Q.* You stood by?

"*A.* Yes, sir."

The deposition of Neil MacDonald was taken. In it appeared the following:

"*Q.* Mr. MacDonald, what was your line of business in August, 1888?

"*A.* I was a member of the firm of W. V. Mc-Cracken & Co.  Our business was railroad contractors and builders.  W. V. McCracken, George A. Evans, and Neil MacDonald.

"*Q.* Where was their office?

"*A.* Nos. 40 and 42 Wall street.

"*Q.* What is Mr. Evans' address now?

"*A.* Mr. Evans is dead.

"*Q.* Mr. W. V. McCracken?

"*A.* He is dead.

"*Q.* What was the relation of that contracting firm to the securities of the Toledo, Saginaw & Muskegon Railway?

"*A.* W. V. McCracken & Co. agreed to build the road and took the securities of the Toledo, Saginaw & Muskegon Railway Company.

"*Q.* That was under general contract?  Did they perform the contract and build the road?

"*A.* They built the road to Ashley, Mich., about 100 miles from Muskegon.

"*Q.* Was that done under a contract to build that much?

"*A.* As I recall it, the road was to be a little longer, but we took the contract to build the road as far as Ashley.

"*Q.* Where did you get the securities for the work?

"*A.* We got bonds and stock of the Toledo, Saginaw & Muskegon Railway Company.

"*Q.* What bonds did you get?

"*A.* As I recall it, there was an original lot of 1,600,000 bonds (6 per cent. bonds) that we got.

"*Q.* You mean by that $1,600,000 of bonds?

"*A.* Yes.

"*Q.* Do you remember the date of these bonds?

"*A.* No, I cannot tell the date, but I think (I feel certain) it was in 1886.

"*Q.* If it will refresh your memory, was it one of the last months of the year?

"*A.* I have been looking into the matter and think it was November, but I am not prepared to say, but I can easily find out.

"*Q.* Mr. MacDonald, what did the firm do with these bonds; I mean to say, as to selling them on the market or otherwise?

"*A.* These bonds were made away with, or de-

stroyed, to make way for another issue of 5 per cent. bonds.

"Q. The question is whether all of these were made away with?

"A. As I recall it, I am certain that I was not present at the time they were made away with to make way for the new 5 per cent. bonds. As I recall the matter, the whole original issue of $1,600,000 6 per cent. bonds was offered to our company for the purpose of building the road above referred to.

"Q. Before, after, or concurrent with the building?

"A. Before the building. As I was the financial member of the firm, I decided that an issue of 5 per cent. bonds could be as easily handled by me, making, of course, the saving in interest. The original bonds (the 6 per cents.) were then destroyed, as I supposed.

"Q. Do you know what the intention of the firm was with reference to their destruction?

"A. To make way for the new 5 per cent. mortgage, which would, of course, not be a good mortgage with the original bonds out.

"Q. At the time of what you call their destruction, who owned and possessed the $1,600,000 bonds?

"A. McCracken & Co., subject to our performing the contract.

"Q. On the day when you supposed they were destroyed, to wit, on August 9, 1888, will you state who handled and destroyed these bonds?

"A. Up to the time they were destroyed, Mr. McCracken.

"Q. Up to that time and from and after getting possession of them, what, if any, sales had McCracken & Co. made of any of these bonds?

"A. No part of this issue was ever sold, given away, or loaned.

"Q. What would have been the market value or the success in marketing the bonds of that road?

"A. As the road was not built, it would be impossible to say. At the time they would not have had any market value.

"Q. When were these bonds offered to McCracken & Co. in 1886?

"A. As I recall it, the latter part; I think November.

"Q. As I understand it, you were directed to sur-

render the entire loan of bonds in 1888, Mr. Mac-Donald?

"*A.* Yes.  *  *  *  They were kept in our safe

"*Q.* How were they kept in your safe?

"*A.* Perhaps I had better say for the period of time they were kept in the American Loan & Trust Company, in the safe deposit box of the American Loan & Trust Company.

"*Q.* Were these bonds accessible to any one while in your safe?

"*A.* As I recall it, they were, Mr. Brinckerhoff.

"*Q.* You received these $1,600,000 bonds and the stock which you spoke of as compensation for the work to be done under your contract with the railway company?

"*A.* I would say as consideration; perhaps compensation might do; but as compensation that was all we received for the building of the road. The bonds were ours absolutely.

"*Q.* Where did you get the funds to build the road under the contract?

"*A.* Only of these 6 per cent. bonds which were destroyed.

"*Q.* Did you not do the work under your contract between November, 1886, and August, 1888?

"*A.* Yes.

"*Q.* How much work, more or less, did you do during the 18 months?

"*A.* I think the road was practically completed in that time.

"*Q.* Where did you get the funds to carry on the construction work?

"*A.* McCracken & Co. had plenty of money and could get millions on demand.

"*Q.* You built this road, then, out of your own resources and money which you borrowed?

"*A.* Yes.

"*Q.* What was your procedure when you borrowed money to carry on the construction work on this road? How did you go about borrowing such funds?

"*A.* I suppose you refer to this road when you ask that. They would take the liquid assets, of which we had abundance in the safe at all times, and go out and borrow the money.

"*Q.* With these securities as collaterals you would borrow money?

"*A.* Yes.

"*Q.* What do you mean, Mr. MacDonald, by liquid assets?

"*A.* Readily salable securities.

"*Q.* Did you use these bonds as collateral securities?

"*A.* According to my remembrance we never used one of these bonds as collateral security.

"*Q.* Would you consider these railway securities as liquid assets?

"*A.* No.

"*Q.* Who had access to these bonds while they were in your safe?

"*A.* Anybody in our firm could have had access to them, but they were in charge of Mr. Pennington, private secretary of Mr. McCracken & Co.

"*Q.* The other members of the firm of McCracken & Co. had access to the safe?

"*A.* There were only two members besides myself, W. V. McCracken and George A. Evans; but, as a matter of fact, the McCracken safe was generally managed by the private secretary and bookkeeper, Mr. Pennington, and if we had occasion to use anything in the safe we would send for Mr. Pennington.

"*Q.* Did any member of the firm have the exclusive duty of raising the money upon your assets to carry on the construction work?

"*A.* I had that exclusive function.

"*Q.* During the summer of 1888, what became of these bonds?

"*A.* The bonds were destroyed in the summer of 1888.

"*Q.* Prior to their destruction what did you do with them?

"*A.* Nothing was ever done with these bonds, as we intended to have them destroyed; they were as so much waste paper. (Mr. Brinckerhoff objected. Asked to have that answer stricken as not responsive. Mr. Stanley objected to its being stricken out as irresponsive.)

"*Q.* What did you do with the bonds when you you removed them from your safe in the summer of 1888?

"*A.* Personally I did not do anything with them.

"*Q.* Then you have no personal knowledge of anything concerning these bonds subsequent to the time they were removed from your safe?

"*A.* No.

"By Mr. Stanley:

"*Q.* You say that these bonds were never lent by your firm? I will ask if they were ever pledged for loans?

"*A.* Never, according to my remembrance. They were never used in any financial transaction.

"*Q.* When was the plan formed of having them replaced by 5 per cents.? ·

"*A.* Shortly after our original contract, whatever date that was.   *   *   *

"*Q.* You say that your firm got, of the new 5 per cent. bonds, practically 1,560. Can you not say what the exact amount was?

"*A.* I think it was exactly 1,560. I had 1,560 bonds to deal with.

"*Q.* That you remember?

"*A.·* Distinctly.

"By Mr. Brinckerhoff:

"*Q.* Why did you receive 40 bonds less of the new issue than of the old issue which you surrendered?

"*A.* I don't know that I can tell you the exact reason, but, as we were the sole owners of the road, we had it all anyway whether it was 1,560 or 1,600; it was all ours. There was some reason, but I don't seem able to recall it.

"*Q.* Do you mean by that that you owned all the securities—all the bonds and all the stock?

"*A.* We were practically owners of the road and of practically all the stock.

"By Mr. Stanley:

"*Q.* Mr. MacDonald, was this evidence, then, that you took the 1,560 bonds before you had any arrangement for either a deal with the Grand Trunk Railway or any connection with the Grand Trunk, and you took the 1,560 of the new issue under a direct arrangement of some kind with the Grand Trunk?

"*A.* I cannot say as to that; I was what you might call the financial end of affairs, but it was 20 years ago, and I cannot quite testify as to that.

"*Q.* You would not say that it was not the case?

"*A.* No."

The witness who took the bonds to New York testified as follows:

"Mr. Muir, who has been mentioned, met me at the trust company's office and there was present Mr. ———— and Mr. Berry, whose deposition has been read, and Mr. O. D. Baldwin, whose signature is on Exhibit C. Some one brought in a lot of these bonds that have been referred to as 6 per cent. bonds of the same road, and I remember distinctly going down to the furnace below the office with two or three of the clerks who had counted them, and the janitor had been called up and had been asked to build a fire there, and when we went down there was a fire burning and these piles of pamphlets or bonds were put into that furnace, and then we came upstairs then and I made out for Mr. Muir in my handwriting this Exhibit G, and he signed it, and at the same time Mr. Baldwin delivered to us his signature to Exhibit 6."

The deposition of the defendant was taken. He produced bond 1401. He testified that he was the sole survivor of a firm of New York brokers known as Peters, Schenck & Co.; that the firm went out of existence in 1891, and that he was the owner of the bond; that he received it upon the division of the assets of the firm in 1893 or 1894; that he put it in a box with mining shares that since became worthless; that its existence was overlooked until about two years before the suit was brought. On the cross-examination he testified in part as follows:

"Q. Have you any bill of sale of this bond or paper to show sale of this bond?

"A. None that I know of. There was an agreement signed by the partners, dividing the assets of the firm equitably. This was in full satisfaction between the partners.

"Q. Do you know how your firm became possessed of this bond?

"A. I have not the faintest idea.

"Q. You don't know who put this bond up?

"A. I was not in the bookkeeping department. I

was a member of the board of exchange and my work was on the exchange.

"*Q*. Did you ever collect coupons on that bond?

"*A*. Not that I am aware of.

"*Q*. Do you know whether the firm did?

"*A*. Not the slightest idea.

"*Q*. Is there any one in the city of New York who would know better than you say you know as to who used that bond as margin?

"*A*. All my partners are dead; my bookkeeper, who had the power of attorney, died five years ago, and my cashier died six or seven years ago, and I am the only surviving one.

"*Q*. Do you know whether other bonds of this road were put up as margin at the same time?

"*A*. No.

"*Q*. Was there any memorandum made between you as partners which recited the assets which were to go to you and the assets that were to go to your partners?

"*A*. Yes, also a release that was given of the whole matter regarding Peters, Schenck & Co.

"*Q*. Who divided these assets?

"*A*. Mr. Schenck and myself, I think.

"*Q*. At the time of the division of the assets, you took note of the value of each item that went to you and which went to your partner, Mr. Schenck?

"*A*. Everything had been charged on the books to profit and loss, and when we come to close up, Mr. Schenck said to me, or Mr. Benedict, my bookkeeper (he took principal charge of those matters), and either Mr. Schenck or Mr. Benedict said to me that these things were equally divided.

"*Q*. Do I understand that you, then, personally did not note the division of these assets, but you left it to your clerk and assistant to do it?

"*A*. My impression was that Mr. Benedict and Mr. Schenck rendered the account to me.

"*Q*. Have you that account or release?

"*A*. I cannot find it anywhere. I think all the partnership papers were destroyed in 1901 when the books were destroyed.

"*Q*. You refer to this bond as among a lot of assets that were turned over to you and which were regarded as worthless?

"*A*. The mining stocks which were in the box I regarded as worthless three years ago.

"*Q*. This bond was included in the assets which were turned over to you as worthless?

"*A*. You misunderstand me. I say that the mining stocks I took out and examined three years ago I then regarded as worthless. When the firm expired they were not worthless.

"*Q*. You discovered this bond two or three years ago in a box of assets of your old firm, which assets you had regarded as worthless?

"*A*. They were no longer assets of the firm. They were my personal property. The assets of the firm had been divided, and they were my personal property.

"*Q*. The assets of the firm were divided in 1893 or 1894 and you had not examined this box of assets of the old firm, now your property, between 1893 or 1894 and 1905, had you?

"*A*. I have been to the box several times during that time.

"*Q*. Did you never notice this bond?

"*A*. Not to my recollection.

"*Q*. How has it happened that you produce this bond so long after the time of this dissolution?

"*A*. It was the first time that I had taken particular notice of it.

"*Q*. Had you handled the bonds of this road other than this bond at any time?

"*A*. Not that I know of.

"*Q*. At the time of the division of the assets, I understand you to state that a statement distinct from the release was given, showing what was given to you in the division and what was given to your partners?

"*A*. To the best of my recollection.

"*Q*. I understand that the statement has been destroyed?

"*A*. That is my impression, as I would have found it.

"*Q*. When did you look for it?

"*A*. At the time I first saw those securities there, and I have looked for it since.

"*Q*. Your knowledge of this method by which this bond came into your firm's possession, and the way in which this bond came into your firm's possession, is

only a surmise that it was probably put up as margin by one of your customers, but which one of your customers you have no means of knowing?

"*A.* No, none at all.

"*Q.* And from the time of the dissolution of the firm when such assets in the division as came to you from the firm were put into this box in 1893 or 1894, until within a couple of years, although you had examined the box and its contents, your attention had never been called to this bond until about two years ago?

"*A.* No.

"*Q.* When were your books destroyed?

"*A.* 1901. Ten years after the dissolution.

"*Q.* Where were they destroyed?

"*A.* Destroyed by Mr. Schenck, down at his house at Lawrence, Long Island. We had a pile of books larger than this desk. They were all destroyed. He asked my consent, and I said, 'Certainly.'

"*Q.* Your recollection of the destruction was that he burned them?

"*A.* Yes.

"*Q.* When was the record of this account between you, as partners, or the memorandum as to the division of assets, when was that destroyed?

"*A.* I can't tell you whether it was lost or destroyed. If it existed, and I am not sure that it did, it must have been in the box. It was not in the box.

"*Q.* When did you last see it?

"*A.* I cannot fix any date of it. It must have been prior to 1900.

"*Q.* Have you any list of your customers?

"*A.* I cannot tell you any, except some of the most prominent ones. We had 600 or 700 names on the books and I cannot tell you the names of the smaller ones.

"*Q.* And you cannot relate this bond and its possession to any one of these customers?

"*A.* I cannot place it at all in any way."

In the brief of counsel for the complainant we find the following:

"It is said that the burden never shifts. In this case the burden of proof is on the complainant to satisfy the court by a preponderance of the evidence

that it would be inequitable to allow the defendant to recover the amount of the bond and coupons. But when we have shown, as above, that there was no way for this bond to have escaped the fire except by loss or theft or a fraudulent act amounting to theft, we have shown we should have a decree. * * * The holder of a negotiable instrument is not bound to introduce any evidence to show that he gave value for the instrument until the other party has clearly proved that the consideration of the instrument was illegal or that it was fraudulent in its inception or that it had been *lost or stolen* before it came to the possession of the holder, citing Story on Bills (4th Ed.) § 416; Byles (10th Ed.) 119; 1 M. & W. 425; [*Sistermans* v. *Field*] 9 Gray [Mass.] 336. Judge Story said that nothing short of fraud, not even gross negligence, is sufficient to overcome the presumption furnished by possession that the holder is the proper owner and lawful possessor, citing cases. Lord Denman said (1 A. & E. N. S. 498) that it requires fraud, felony, or some such matter to be proved in order to overcome the presumption. The burden of proof against the holder of coupons payable to bearer is on the party who assails his possession [*Ranger* v. *Cary*] 1 Metc. [Mass.] 369; *Smith* v. *Sac County*, 11 Wall. [U. S.] 139, 154. But in this case not only is there no proof of *bona fides* but *bona fides* is inconsistent with (that is, is contradicted by) all the other proofs in the case. Defendant attaches too much weight to the fact that his bond is not destroyed as foundation of the presumption of good faith and a right to sue. That fact is entirely consistent with our theory of a loss or theft, and it helps to make out loss or theft."

We agree with the statement of counsel as to the law of the case.

In Jones on Corporate Bonds and Mortgages (3d Ed.), § 190, the following language appears:

"Although they contain an agreement for their conversion into stock, the coupon bonds of a railroad company, payable to a person named or bearer, are negotiable instruments, with the privileges of such paper; and so, although the bonds contain an agreement on the part of the company to make what is

termed 'scrip preferred stock' in exchange therefor at any time within ten days after any dividend should become payable on such stock. Such an agreement is independent of the pecuniary obligation contained in the instrument, and does not change the duty of the company with respect either to the principal or interest stipulated. Whether the agreement to convert into preferred stock is of any value or not, it can in no way affect the negotiable character of the instrument; and therefore the title of a bona fide holder is good, although the bonds may have been stolen from the former owner.

"Where it further appeared that to such bonds there was attached by a pin the certificate of such preferred stock, which stated that the bondholder was entitled to a certain number of shares of such stock, and that upon the surrender of the bonds he should be entitled to receive the stock, the bonds having been stolen and negotiated to one who took them without actual notice of any defect in the title to them, the fact that the certificate originally attached to the bonds had previously been detached was held not to be a circumstance sufficient to put the person who took the bonds upon inquiry as to the title of the previous holder. The title of a person who takes negotiable paper before due for a valuable consideration can only be defeated by bad faith on his part, which implies guilty knowledge or wilful ignorance of facts impairing his title; and the burden of proof lies on the assailant of the title."

Section 200 of the same authority reads:

"A purchaser of negotiable bonds before due, for a valuable consideration, in good faith and without actual knowledge or notice of any defect of title, holds them by a title valid as against every other person. Even gross negligence at the time of purchase does not alone defeat the purchaser's title. A purchaser may have had suspicion of a defect of title, or knowledge of circumstances which would excite such suspicion in the mind of a prudent man; or he may have disregarded notices of stolen bonds; and yet, if he has purchased for value in good faith, his title cannot be impeached. Such suspicion, or ground of suspicion, or of knowledge on his part, may be evidence

of bad faith; but before his title can be impeached his bad faith must be established. It must be shown that he did not purchase honestly. The protection accorded to a purchaser of such bonds extends to the mortgage given to secure them.

"It is a presumption of law that the person presenting a negotiable bond is a bona fide holder, and until evidence is introduced tending to negative that presumption, he is under no obligation of proving himself a bona fide holder."

See *Walnut* v. *Wade,* 103 U. S. 683; *Ottawa* v. *National Bank,* 105 U. S. 342; *Hovey* v. *Sebring,* 24 Mich. 232 (9 Am. Rep. 122); *Hogan* v. *Dreifus,* 121 Mich. 453 (80 N. W. 254); *Massachusetts Nat. Bank* v. *Snow,* 187 Mass. 159 (72 N. E. 959).

Has the complainant so met the rule of law that it should escape liability? The bond was produced before us upon the hearing. It and each of the coupons is payable to bearer. It is conceded it is the original bond. It does not bear the slightest evidence of fire or any trace of any effort to cancel it. The whole of the testimony introduced on the part of the complainant was to show that all of the first issue of bonds were destroyed by fire. The bond itself is a complete refutation of that theory so far as relates to it. The defendant testifies that he is the owner of the bond and gives his explanation of how it came to him. It is unfortunate that so many of the people who knew about the transaction are dead. The statement of the trustees in the letter of August 1, 1888, as follows:

"It appears that a prior mortgage to this was executed by the railway company to you as trustees to secure an issue of bonds, dated November 1, 1886, in the amount of $1,600,000. The bonds under this last-named mortgage, it is said, have not been sold but have been pledged as collateral security for money loaned. It has been arranged between the railway company and W. V. McCracken & Co., who own the bonds issued and outstanding under your mortgage,

that these bonds shall be retired by the substitution of bonds issued under the mortgage in which the undersigned are trustees"—and the testimony of Mr. MacDonald: "*Q*. You say that your firm got, of the new 5 per cent. bonds, practically 1,560. Can you not say what the exact amount was? *A*. I think it was exactly 1,560. I had 1,560 bonds to deal with. *Q*. That you remember? *A*. Distinctly. By Mr. Brinckerhoff: *Q*. Why did you receive 40 bonds less of the new issue than of the old issue which you surrendered? *A*. I don't know that I can tell you the exact reason, but, as we were the sole owners of the road, we had it all anyway whether it was 1,560 or 1,600; it was all ours. There was some reason, but I don't seem able to recall it"—may have some significance.

In any event, bond 1401, which had been issued to W. V. McCracken & Co., was not destroyed. It passed into the possession of a firm of brokers. Upon the dissolution of that firm it came to one of the members as a part of his share of the assets of the firm. We do not think complainant has established a case entitling him to the relief prayed.

The decree is reversed, and one may be entered here, dismissing the bill of complaint, with costs.

STEERE, C. J., and McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.