### CITY OF ADRIAN v. WHITNEY CENTRAL NATIONAL BANK.

1. BILLS AND NOTES—TITLE—BONA FIDES—NEGOTIABILITY.

   A purchaser in good faith acquires valid title to negotiable bonds payable to bearer, although they may have been stolen by the prior holder.

2. SAME—EVIDENCE—BURDEN OF PROOF.

   Such holder has the burden of proving that he is a holder in due course, within the meaning of the negotiable instruments law. Act No. 265, Pub. Acts 1905 (2 How. Stat. [2d Ed.] § 2672 *et seq.*).

3. SAME.

   Where defendant bank made a loan to the manager of a hotel on the security of two municipal sewer bonds, payable to bearer, and the bank ascertained before taking the pledge that he was in fact manager of the hotel, but had no notice that his title was bad or the bonds had been stolen by him, it was a bona fide purchaser and acquired the title as against the owner who had intrusted the securities to him for safe keeping while living as a guest at the hotel.

Appeal from Lenawee; O'Mealey, J. Submitted January 9, 1914. (Docket No. 35.) Decided April 7, 1914.

Bill by the city of Adrian against the Whitney Central National Bank and Anna M. Weiss for an order of interpleader. From a decree for defendant bank, the other defendant appeals. Affirmed.

*Baldwin & Alexander*, for appellant.

*D. B. Morgan*, for appellee Whitney Central National Bank.

STEERE, J. In this case Anna M. Weiss has appealed from a decree of the circuit court of Lenawee county, rendered on a bill of interpleader filed by the city of Adrian, for the purpose of protecting itself against conflicting claims of defendants, and to have determined which of them is entitled to receive the principal and interest due and to fall due on two sewer bonds for $1,000 each, issued by said city of Adrian on November 1, 1906, to bearer, and payable on the 1st day of November, 1923, with interest at the rate of 4 per cent. per annum, payable semi-annually.

The two bonds in question, numbered 99 and 100, were, at the time of issuing the series to which they belonged, purchased by Frank X. Weiss, since deceased, and by the terms of his will became the property of defendant Anna M. Weiss, his daughter-in-law. The bonds of that issue were in short and simple form, appropriate for sale to the general public; the portion material here being as follows:

"The city of Adrian, a municipal corporation, hereby promises and agrees to pay to bearer the sum of one thousand dollars, together with interest thereon at the rate of four per cent. per annum as evidenced by the annexed interest coupons.

"This bond is one of a series of seventy-five thousand ($75,000) dollars bonds for public sewer purposes, said bonds being numbered from 1 to 124 inclusive.

"The same is due and payable at the city treasurer's office of the city of Adrian on the 1st day of November, 1923.

"Pay to the bearer the amount of each of the interest coupons hereto attached, as the same shall severally become due."

On November 1, 1910, the Whitney Central National Bank, of New Orleans, La., presented the coupons then due upon the two bonds in question to the Adrian city treasurer for payment, making claim that it was the lawful holder, in due course, of said bonds and coupons. Previous to this, the city treasurer had received two letters from defendant Anna M. Wiess claiming said bonds had been stolen from her, and requesting that, if any one presented them for payment, they should be taken up, and the party presenting them arrested.

Payment being refused, the Whitney Central National Bank commenced an action at law against the city of Adrian in the circuit court of Lenawee county to recover the amount due on the two coupons, which had become due and payable. Complainant, declaring itself ready and willing to pay the amount due on said bonds to the proper parties, filed this bill, asking the aid of the court to determine who is entitled to demand and receive payment, and that in the meantime an injunction issue restraining further prosecution of said suit instituted against it to recover the amount of said coupons. Both defendants answered.

The Whitney Central National Bank claimed to have become the holder of said bonds and coupons in due course of business, in good faith, for value, without any notice of infirmity or defect of title in the party negotiating the same; said party being one E. C. Gray, the apparent owner, who presented said

bonds at the banking office of defendant, in the city of New Orleans, on August 6, 1910, claiming to be the owner, and there negotiated and delivered them to said bank, as collateral to secure certain notes given for loans made to him, which loans have not been paid.

Defendant Anna M. Weiss, answering, claimed that the bonds belonged to her, and were taken from the safe of a hotel in New Orleans at which she was a guest, without any authority from her and under such circumstances as to make the taking larceny; that she was subsequently informed the clerk or manager of said hotel took them from the safe and "put them up with the Whitney Central National Bank as collateral to his note for a loan to pay a gambling debt to one of the officers of said bank." She also requested in her answer that the issue be tried by jury. A jury was called, but, it being subsequently agreed between counsel that the case should be heard and determined by the court, the services of the jury were dispensed with.

The testimony shows that E. C. Gray, who negotiated the bonds with defendant bank, was then manager of the De Soto Hotel in New Orleans, having assumed that position some time in June, 1910, going there from Detroit, where he had held a position in the Detroit Club. Defendant Anna M. Weiss was a resident of the city of Adrian, and quite intimately acquainted with him. She testified that she had known him for about a year before he went to New Orleans, and had joined him at the De Soto Hotel under a previous arrangement that she was to go down there and have a position as cashier; that there was an understanding between them they might some time be married, although she knew he had a wife and child living in Detroit, but he had assured her he would get a divorce from his wife; that she took her

private papers with her, including the bonds in question, and, on her arrival in New Orleans, she was met at the station by Gray, who took her to the De Soto Hotel, where he registered her under the name of Mrs. Du Bois, of Chicago, introducing her as his niece; that, while in New Orleans, she went by that name at his request, and they occupied adjacent rooms in the hotel, with a door between; that he told her there was a safety deposit vault in the hotel for guests to put their valuables and papers in, and she should put hers there; that she gave them to him for that purpose, and he put them in the safe; that she had confidence in him at that time and paid very little attention to it; that she never was employed in the hotel, but remained as a guest as long as Gray was there. It was while they were living at the De Soto Hotel that Gray negotiated the bonds with the Whitney Central National Bank.

As to the circumstances of the negotiation, it appears undisputed that on the 6th of August, 1910, Gray applied at the bank to negotiate a loan of $750, stating that he was manager of the De Soto Hotel in that city, and would give as collateral for the loan the bonds in question, which he produced. He further stated that he was related to a Mr. Smith, assistant to the president of the First National Bank of Detroit, Mich., that these bonds represented money which he had saved in the past, and, having temporary need of money, he desired to borrow, using the bonds as collateral. After examining the bonds and discussing the matter with him, the president of the bank telephoned the De Soto Hotel and ascertained that Gray was manager there, as he had represented. Relying upon the information thus obtained, believing Gray's statements, and knowing that bonds of this character were sought after and considered desirable, as they were payable to bearer, and there were no suspicious

circumstances in connection with the offer, the bank made the loan of $750 to Gray, taking one of the bonds as collateral security. Gray deposited the money in the bank, and checked it out from time to time. On the 27th of August, 1910, he applied to the bank for a further loan of $500, offering as security the other bond. No suspicious circumstances having arisen in the meantime, the loan was made; the money being deposited and checked out as before. On September 10, 1910, he borrowed $250 more on his note, secured by the second bond which the bank held. This loan was negotiated with the vice president of the bank, who, since the other loans were made, had returned from abroad, and was living at the De Soto Hotel, thus becoming acquainted with Gray as its manager. He testified Gray impressed him favorably, and, so far as he could judge by seeing him around the hotel, his habits were correct, and he knew nothing to the contrary until after Gray had left the city. The notes Gray gave were what are generally known as collateral notes, pledging the bonds attached as security, with authority to sell in case of default, covering any and all indebtedness which he might owe to the bank, and all costs which might be incurred in connection therewith.

On the 8th of October, 1910, Gray presented to the Whitney Central National Bank a check drawn on Adrian State Savings Bank for $300, payable to bearer, and purporting to be signed by Anna Weiss. He indorsed this check, and the bank cashed it for him. The bank then forwarded the same through the usual channels to the Adrian State Savings Bank for collection, and payment was refused because the genuineness of her signature was questioned.

All officers of the bank who had anything to do with making these loans testified that they never heard or had any intimation of Gray's gambling or of any-

thing wrong in relation to him or any question as to his ownership of the bonds until after payment of the $300 was refused. About this time Gray lost his position at the De Soto Hotel and left New Orleans, going to Covington, La., where he assured defendant Anna Weiss that he expected to get a position. She joined him there, and they stopped for some time at the Southern Hotel in that city. She testified she remained there a month or a little more; that one day he informed her he had a position as manager or assistant manager of the Battle Hotel, Mobile, and departed for that city, stating that he would get her a position in the hotel at Mobile and send for her, when she should come on and bring his trunk which he had left with her. While she was waiting at Covington, the trouble arose over nonpayment at Adrian of the $300 check purporting to be signed by her, which Gray had negotiated with the Whitney Central National Bank. It was in that connection she first discovered, as she states, that the bonds were not among her papers, which she had taken with her when she left the De Soto Hotel, and she then notified the city treasurer of Adrian that the same had been stolen. It was her testimony that she never authorized Gray to hypothecate these bonds or to sign any check for her; that she had confidence in him and believed him honest until after the matter of the $300 check came up and she went back to New Orleans, when she first learned from the bank officials that Gray was a gambler, and the full measure of his perfidy. Of her final disillusioning she testifies: "Gray had turned against me, and his wife was there, and I was all alone."

If, at the time Gray hypothecated the bonds which she had put into his hands, she, with her intimate acquaintance and knowledge of him, believed him honest and trusted him implicitly, as she states, she is, at least, at a disadvantage in urging that the bank

was not an innocent party and acted in bad faith when accepting the bonds, payable to bearer only, presented by him under the circumstances shown, as security for a loan.

Several bank officials of Adrian testified in behalf of defendant Weiss as expert witnesses to the effect that custom and good usage in the banking business demanded greater precautions than those shown to have been taken by the defendant bank; the contention upon that proposition being stated in her counsel's brief as follows:

"We have shown by the testimony that in the usual and ordinary course of banking business, that the appearance of a stranger in a bank with bonds such as these bonds was a circumstance in itself which has come to be recognized by bankers as a danger signal, and that good bankers in due course do not purchase or loan money to strangers upon bonds of which they have no knowledge, either as to the title or as to the value."

In support of which is cited *Smith* v. *Mechanics' & Traders' Bank*, 6 La. Ann. 610. The facts in that case are not in harmony with those under consideration. There the plaintiff, a broker, discounted, without inquiry, for an entire stranger a forged bill purporting to be drawn on and accepted by a commercial house of New Orleans, and gave a check on the defendant bank payable to the order of the supposed acceptors of the bill. The broker, the bank, and the commercial house were all located in the city of New Orleans. It was held the plaintiff did not exercise due caution in taking the bill from a stranger without inquiry, and that making out his own check to the order of the supposed acceptors of the bill instead of the party to whom the bill was discounted was not in the usual course of business. Here the party presenting the bonds was ascertained to be a resident of the city, occupying a responsible business position. He

produced the bonds, payable to bearer, with no other payee named, and was presumptively the owner of them; no indorsement or signature being required to transfer title. In *Consolidated Ass'n of Planters* v. *Numa Avegno*, 28 La. Ann. 552, the attitude of that court in a case more closely analogous to this is shown. It is there held that bonds, with coupons attached, payable to bearer are negotiable securities, having all the qualities of commercial paper, and pass as such by delivery. That, though stolen from a bank by burglars, the purchaser, acquiring them in good faith, before maturity, for value, in due course of business, is unaffected by want of title in the vendor. In *Wylie* v. *Railway Co.* (C. C.), 41 Fed. 623, it was said of stolen bonds:

"The bonds being negotiable, the promise to pay runs to the holder, and, if he has acquired them bona fide and for value, the plaintiff's title is gone, and the promise is satisfied by the payment to the holder according to their tenor."

The law is well settled by abundant authority that a purchaser of stolen negotiable bonds before maturity, without fraud or bad faith, obtains good title thereto. *Welch* v. *Sage*, 47 N. Y. 143 (7 Am. Rep. 423); *Seybel* v. *National Currency Bank*, 54 N. Y. 288 (13 Am. Rep. 583); *Evertson* v. *National Bank*, 66 N. Y. 14 (23 Am. Rep. 9).

The cardinal principles upon this subject have been condensed and crystallized into statute law in many States by the uniform negotiable instrument act. This has been enacted in both Michigan (Act No. 265, Pub. Acts 1905, 2 How. Stat. [2d Ed.] § 2672) and Louisiana (Gen. Assem. Acts 1904, No. 64). The rights of the contesting parties here are to be determined by the provisions of this statute, which, however, this court has held, introduced no change in the rules relative to a holder in due course. *Graham* v. *Smith*, 155 Mich. 65 (118 N. W. 726).

It must be taken as undisputed that, though Gray came lawfully into possession of these bonds, he did not have title to them.  On their face they were regular and complete, payable to bearer only, were negotiated and delivered by him under claim of ownership to the defendant bank, before maturity, for value, with no notice that they had been  previously dishonored, or that there was any infirmity or defect in his title to them.

It is claimed in behalf of defendant Anna Weiss that the bank failed to prove that it was "a holder in due course;" it having the  burden of proof on that question under section 61 of said  negotiable instrument act, which provides as follows:

"Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course."

Section 54 of said act provides:

"A holder in due course is a holder who has taken the instrument under the following conditions: *First,* that it is complete and regular upon its face; *second,* that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; *third,* that he took it in good faith and for value; *fourth,* that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 58 provides:

"To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The numerous authorities upon a holder in due

course are found on pages 309 and 310 of Ogden on Negotiable Instruments, and it would be superfluous to review them here.

In Jones on Corporate Bonds and Mortgages (2d Ed.), § 200, using the following language, quoted with approval by this court in *Toledo, etc., R. Co.* v. *Peters,* 177 Mich. 76 (143 N. W. 18), it is said:

"A purchaser may have had suspicion of a defect of title, or knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or he may have disregarded notices of stolen bonds; and yet, if he has purchased for value in good faith, his title cannot be impeached."

In this case the evidence is conclusive that the bank officials had no such suspicion, knowledge, or notice at the time the bonds in question were negotiated.

Testing the obligations, duties, and risks of the defendant bank by the statute and authorities cited, in the light of the facts and circumstances proven, we are constrained to hold that it is shown to have acted without bad faith, and to be the holder of said bonds "in due course."

The result reached by the learned circuit judge is well supported by reason and authority, and his decree is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OS-TRANDER, and MOORE, JJ., concurred. BIRD, J., did not sit.