### WEST MONROE STATE BANK v. CALVERT.*

No. 4378.

Court of Appeal of Louisiana. Second Circuit.

Dec. 16, 1932.

Theus, Grisham, Davis & Leigh, of Monroe, for appellant.

Hudson, Potts, Bernstein & Sholars, of Monroe, for appellee.

PALMER, J.

Plaintiff sues to recover of the defendant the sum of $1,400, representing the amount of a loss plaintiff sustained in handling a piece of paper in the form of a cashier's check in the sum of $2,500, for a party known in West Monroe as Walter K. Johnson, who was brought to the bank and introduced to the cashier by the defendant.

Plaintiff's allegations are substantially as follows: That on June 18, 1921, defendant brought a party into the bank, whom he introduced as Walter K. Johnson, and advised plaintiff's cashier that Johnson had an exchange which he, defendant, wanted the bank to handle, and that he, defendant, had an interest in it to the amount of $500 because of a land sale he was making to Johnson; that the item, when presented by Johnson, was in the form of a cashier's check, being in the sum of $2,500, and purported to have been issued to the order of said Johnson by the Southwest National Bank of Oklahoma City; that defendant was at the time a director of the bank and was one of its vice presidents, and, because of the absence of the president, was the ranking officer of the bank at that time; that the cashier, acting upon the orders of defendant, who was vice president, handled this item, paying to Johnson $500 in cash and placing the remainder to his credit; that a short time later during the same day Johnson withdrew from the bank an additional amount of $900, and that, in addition thereto, plaintiff cashed Johnson's check issued to defendant in the sum of $500, making a total of $1,900 paid by it to said Johnson or to his order; but that defendant later returned the said $500 which he had received; that the said check was a forgery and its payment was refused by the Southwest National Bank of Oklahoma City, and that the said Johnson was a swindler and immediately disappeared on the same day; that its cashier would not have paid any money on this check except for the fact that he was directed to do so by defendant, his superior in charge of the transaction; that said Johnson was in fact a stranger to plaintiff and to defendant; also, that defendant gave its cashier instructions to handle the said item without first attempting to investigate its genuineness, knowing plaintiff's cashier would carry out defendant's orders.

Defendant answered, admitting that he went with Johnson to the bank and introduced him to the cashier; that he did tell the cashier he had made a land deal with Johnson and was to receive out of the said check the sum of $500, but denies that he gave the cashier any directions or instructions, and in fact, he denies he had any authority to give such orders. He alleges that he was on a deal with Johnson, believing him to be in good faith, and that he did not represent the bank in any manner, but represented himself alone; that, while he was a director and vice president of the bank, he took no part in its operations and had no authority to do so; that he did not guarantee the integrity of the said check; and that whatever losses plaintiff may have sustained on account of handling the check were due entirely to the carelessness, negligence, and lack of diligence on the part of plaintiff's cashier.

From a judgment rejecting its demands and dismissing its suit, plaintiff prosecutes this appeal.

Opinion.

This case involves legal questions almost altogether. The undisputed facts are substantially as follows: The party known as Walter K. Johnson, who committed the alleged forgery, ran an advertisement in the local paper serving West Monroe, stating that he was in the market to buy some real estate. Defendant answered the advertisement, after which Johnson called to see him. Defendant submitted to Johnson certain properties he had for sale. Johnson told him that he was considering two other pieces of real estate and was obligated to give further attention to them before making a deal, but that he would probably see him later. After two or three days he returned and told defendant he liked the property; that the price was right and he was ready to make a deal. After reaching an agreement Johnson told defendant that he had a piece of paper he would have to clear through a bank and asked him to recommend some bank where he could handle it. Defendant recommended West Monroe Bank and went there with him, introducing him to the cashier, F. G. Thatcher. Thatcher says that defendant, when he and Johnson entered, addressed him as follows: "Mr. Thatcher, this is Mr. Walter K. Johnson. He and I are on a land deal; he has an exchange I want you to handle for him. He is to pay me $500.00 out of it." Herein lies the crux of the question of defendant's liability.

Defendant denies that he made that statement in those exact words. He says he used the pronoun *he* instead of the pronoun *I*, as to who it was that wanted the bank to handle the exchange. Thatcher, however, was corroborated in his testimony on this point by Mrs. Mahaffey, an employee of the bank who was present at the time.

It is the contention of plaintiff that the de-

fendant is responsible on the following two grounds: (1) That the forged check was handled by the cashier under defendant's directions, he being the superior officer in the bank at the time; and (2) that a fiduciary relationship existed between defendant and plaintiff which placed a higher degree of care upon defendant in this transaction because he was a director and a vice president of the bank; that he failed to object when he should have objected and failed to speak when he should have spoken, allowing the cashier to handle the item, knowing that no investigation had been made, which is in itself such gross negligence as to render him liable.

The evidence is undisputed that defendant, though a vice president, was inactive. He has held that title for many years, notwithstanding, according to the proof, he has never in a single instance attempted to give an order pertaining to the management and operation of the bank affairs, nor has he been called on to do so by the officers actively in charge of the bank.

The theory of plaintiff is that the president was absent at the time, and, in his absence, the defendant, being present, became the ranking officer, and, since he gave the order to the cashier to handle this check, the cashier made no inspection or investigation, not being required to do so under such circumstances, but merely complied with the order of the defendant. We do not find that the facts sustain that theory. The cashier admits that, during his entire service in the bank, which covered a number of years, the defendant had never given an order pertaining to the bank's operations. He was only second vice president and does not appear to have even had an office in the bank building. He apparently visited the bank only when he had personal business to attend to, or was called to attend a meeting of the board of directors.

The cashier was a trained banker and certainly knew that, if he was to depart from the regular course of handling such items by waiving any further identification of the party presenting the check or the genuineness of the check, and was to rely entirely upon the fact that the defendant was directing him in his course, he should have at least secured from the defendant his O. K. on the instrument, which would have settled that part of the controversy. But this he did not do. As the evidence shows, in the absence of the president, the cashier himself had charge of the management of the bank. The highest authority for that statement is the admission of the cashier himself. He further admits that, if he had only given this check a casual inspection at the time it was presented, he would have discovered that its genuineness was doubtful. The crudeness of the work of the drafter of the check is quite apparent on the face of it. He justified himself in not

meeting that clear responsibility by saying that he accepted the transaction as genuine because defendant, being a director and a vice president, brought Johnson into the bank and said he wanted the bank to handle the item, which statement of the defendant he construed as an order from a superior officer. It is clear, when defendant went with Johnson into the bank, he disclosed thoroughly that he had a personal interest in this item, that is, he had negotiations on with Johnson and, if the check was cashed, he was to receive out of the proceeds the sum of $500. Even if it be true that defendant had authority to give orders to the cashier, it is obvious in this transaction that he could not have legally done so because he could not have represented both himself and the bank on account of his personal interest in the transaction.

Whatever were the responsibilities of defendant flowing from his fiduciary relationship as director, they were fully met when he made the disclosure of his personal interest. We agree with counsel for plaintiff that the status of directors is such that they occupy a fiduciary relation toward the corporation, and its stockholders, and that they must not use their position to advance their own personal interests, but the preponderance of the evidence in this case shows that defendant did not violate that principle. We are convinced that he represented no one but himself and that he clearly disclosed that fact to plaintiff's cashier. Even though it may be true that the cashier was less careful than he would have otherwise been if defendant had not been one of the bank's directors, yet the moment defendant disclosed his personal interest in this transaction the cashier was put on notice so he should have acted just as he would have done if defendant had been an outsider altogether. His failure to do so did not arise from any fault of defendant.

Due to the long experience the cashier had had in the banking business, it is presumed that he knew this principle, not only of the law but of good business procedure as well. Plaintiff quotes at length from Thompson on Corporations (3d Ed.) vol. 2, which is a well-recognized authority. In one of its quotations, the rule followed by some of the courts is stated to be: "The directors or trustees of a corporation, in accepting their appointment of office, impliedly undertake to give the company the benefit of their best care and judgment, and to use the powers conferred upon them solely in the interests of the corporation. They have no right under any circumstance to use their official position for their own benefit or the benefit of any one except the corporation itself. *It is for this reason that the directors have no authority to represent the corporation in any transaction in which they are personally interested, in obtaining an advantage at the expense of the*

748

*company. The corporation would not have the benefit of their disinterested judgment under these circumstances, if self-interest would prompt them to prefer their own advantage to that of the company."* (Italics ours.)

The principles stated in this rule are sound and for the most part are in conformity with all our jurisprudence. If in this case, in view of the facts as they exist, the defendant had undertaken to represent the plaintiff also, then he would have been guilty of fraud, rendering him liable because of his personal interest in the transaction. But, according to our appreciation of the evidence, he did not do that. Instead, we find that he, on introducing Johnson to the cashier, frankly disclosed the fact that he was personally interested in having the check cashed because he would get a portion of it to apply on a sale he was making to Johnson, so, as we have previously said, the cashier was immediately put on notice that the defendant was on the side with Johnson in this transaction, therefore defendant neither took, nor apparently sought to take, any advantage of any position he held with the bank, whatever may have been his authority in holding such position. He simply left it to the cashier to handle the item as was usual and customary in such cases, and certainly had a right to expect the cashier to require that all the conditions exacted by good banking were measured up to.

The defendant was only an inactive, second vice president in plaintiff bank, and, under our view of the facts in the case, had no more authority than what was vested in him as a director unless the charter or the action of the board of directors gave it to him. If he had any additional authority, plaintiff, who carried the burden of showing it, failed to prove it. Defendant was clearly not an executive officer of the bank.

Treating defendant as a director, it must be borne in mind that individually he had no power or control in the management of the bank. Directors can only act collectively at a time when a quorum is present. We need look to no other source for authority on this point except our own courts. In the case of Louisiana State Bank v. Senecal, 13 La. 527, it was said: "But directors are not officers of the bank, in the proper sense of the word, nor have they individually any power or control in the management of its concerns: they act collectively, and at stated times, and have otherwise no more to do with the general management of the institution than the other stockholders." See, also, Mercier v. Canonge, 8 La. Ann. 37; Chaffe v. Trustees of Minden Female College, 28 La. Ann. 814.

As a general principle of law it was certainly the duty of the cashier of plaintiff bank, when this item was presented, to have acted in the matter with care and caution, and especially in view of the fact that, according to his own admissions, he was the active officer in charge in the absence of the president. As previously stated, the defendant admittedly was not an active officer and was never known to have given an order pertaining to the management and operations of the bank. This fact was known by the cashier according to his own admissions. Even if the defendant on this occasion attempted to give such an order, the cashier must have known that such a course was exceptionally unusual on the defendant's part and by virtue thereof, instead of giving no attention to the question of genuineness of the check, he should have been moved to give it extraordinary attention, but since the defendant immediately stated that he was personally interested in the cashing of the check, regardless of whether he had any authority to give orders or not, the cashier should have made the usual examinations and investigations before paying out any money on the check, which investigation, if made, according to his own testimony, would have avoided the whole trouble, because he would have readily detected the lack of genuineness of the check. When he cashed that check without giving it any personal inspection whatever, he was guilty of a departure from the usual course followed in such matters of business, and is therefore without right to shift his responsibility to the defendant. Because of his training as a banker he knew how to test the genuineness of this item, but he did not do so. Regardless of how much he desired to accommodate defendant or to treat him with what he believed to be a due courtesy, he should have inspected this check and made other proper investigations, which would have avoided the loss. Not having done so, he now attempts to shift that responsibility to the defendant, a man apparently not familiar with handling banking items.

Though it be true that on account of the fact that defendant was a director and an inactive second vice president, he owed some consideration to the bank in the manner in which he carried this party in and introduced him to the cashier, certainly his responsibility was slight as compared with the responsibility resting on the cashier. Even though their responsibilities were equal and they were equally negligent in the manner in which the check was handled, because defendant immediately revealed the fact that he was personally interested in seeing the check cashed, plaintiff's cashier should have been warned, and plaintiff should stand the loss for the reason that, far more than the defendant, it had the facilities and knew the procedure for making the investigation that ordinary good business procedure required to be followed in that case, and which was omitted. This principle is sustained in the case of Smith v. Mechanics' & Traders' Bank, 6 La. Ann. 610.

In our view the judgment of the lower court is correct, so it is accordingly affirmed, appellant to pay all costs of appeal.